Howard Shanker, (AZ Bar #015547)
The Shanker Law Firm, PLC
700 East Baseline Road
Building B
Tempe, Arizona 85283
Telephone: (480) 838-9300
Fax: (480) 838-9433
howard@shankerlaw.net

Daniel J. Rohlf
Earthrise Law Center
10015 S.W. Terwilliger Blvd.
Portland, OR 97219
Telephone: (503) 768-6707
Fax: (503) 768-6642
rohlf@lclark.edu

Justin Augustine (SBN 235561), Pro Hac Vice
Center for Biological Diversity
351 California St., Suite 600
San Francisco, CA  94104
Telephone: (415) 436-9682
jaugustine@biologicaldiversity.org

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Center for Biological Diversity**; and | ) |
| | ) |
| **Maricopa Audubon Society,** | ) **Civil Action No.:** |
| | ) |
| **Plaintiffs**, | ) |
| | ) |
| v. | ) **COMPLAINT FOR** |
| | ) **DECLARATORY JUDGMENT** |
| | ) **AND INJUNCTIVE RELIEF** |
| **Kenneth Salazar**, in his official capacity as | ) |
| Secretary of the Interior, | ) |
| U.S. Department of the Interior; and | ) |
| | ) |
| **Dan Ashe**, in his official capacity as Director, | ) |
| U.S. Fish and Wildlife Service, | ) |
| | |
| **Defendants**. | |

**INTRODUCTION**

1.      On December 28, 1973, President Richard M. Nixon signed the Endangered Species Act ("ESA") stating that *"Nothing is more priceless and more worthy of preservation than the rich array of animal life with which our country has been blessed."*

2.      Thirty-three years later, the bald eagle exemplifies the ESA's success. Once faced with extinction due to DDT and other threats, today bald eagles thrive in many parts of the country.

3.      Unfortunately, the Sonoran Desert population of bald eagles ("desert eagle") has failed to achieve the recovery success that other bald eagle populations have achieved.  Described as the "Treasure of the Southwest," desert eagles are still on the brink of extinction.  Isolated from other bald eagles reproductively, biologically, behaviorally, and geographically, desert eagles are very rare;  less than 60 breeding pairs are known to exist.  Significantly, the productivity (breeding success) of existing breeding pairs has declined.  A population viability estimate based on data from the Arizona Game and Fish Department suggests that  desert eagles will likely become extinct in approximately 75 years.

4.      In anticipation of just such a scenario as exists in this case, where a discrete, imperiled population of a species requires greater protection or more time to recover than the species' remaining members, Congress amended the ESA to define the term "species" as including "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  ESA § 3(16), 16 U.S.C. § 1532(16). This definition extends the ESA's safeguards to imperiled populations of vertebrate species, even in cases where the remainder of a particular species is not threatened or endangered.

5.      Indeed, Congress amended the ESA's definition of "species" to include "distinct population segments" ("DPS") with bald eagles in mind.  When bald eagle populations in the contiguous 48 states were on the verge of extinction, bald eagle populations in Alaska and Canada were considered stable.  The expanded definition of a species allowed the eagles in the contiguous 48 states to receive ESA protections despite the fact that the species as a whole (due to the Canadian and Alaskan populations) was not threatened with extinction.  In other words, Congress recognized that it was not enough to have bald eagles in Alaska; the populations in the contiguous 48 states mattered as well.  *See e.g.* S. Rep. No. 96-151, at 7 (1979).

6.      The desert eagle faces the same situation.  While most bald eagle populations have successfully recovered, the desert eagle population has yet to overcome significant obstacles on its own road to recovery.  Without continued ESA protections, particularly habitat protection, desert eagles will likely go extinct.

7.      In order to prevent the desert eagle (*Haliaeetus leucocephalus*) from going extinct, the Center for Biological Diversity and Maricopa Audubon Society (collectively "the Center") petitioned the U.S. Fish and Wildlife Service ("FWS" or "the Service") to list the species as endangered pursuant to the Endangered Species Act.  ESA §§ 2-18, 16 U.S.C. §§ 1531-1544.

8.      On August 30, 2006, however, despite the well-documented scientific information demonstrating the reproductive isolation and unique characteristics of the desert eagle, and despite the fact that for more than three decades,  desert eagles have been described as a "unique" population by both independent scientists and the Service, FWS reversed course and declared that desert eagles are not "significant" and thus do not qualify for listing consideration as a DPS.

9.      In addition, despite acknowledging that the Center's Petition detailed numerous threats to desert eagles and their habitat, and despite population viability studies concluding that desert eagles may become extinct within a few decades, FWS nonetheless concluded that Plaintiffs' Petition "does not provide substantial scientific or

1   commercial information indicating that [listing of the desert eagle] may be warranted."

2   The Service also determined that desert eagles are not in danger of becoming extinct in

3   the foreseeable future, despite the fact that the Service has never explained what

4   constitutes adequate population numbers for this population of bald eagles.

5          10.     On March 6, 2008, this Court issued an order declaring the Service's 90-

6   day finding to be arbitrary and capricious, expressing "no confidence" in the objectivity

7   of the agency's decision-making process.  This Court enjoined the application of the

8   final delisting rule, ordered the Service to conduct a lawful determination on the desert

9   eagle listing status as a DPS, and remanded to the Service to commence a 12-month

10  status review. *Center for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-

11  MHM, 2008 WL 659822, at *11 (D. Ariz. Mar. 6, 2008) [hereinafter *CBD v.*

12  *Kempthorne*].

13         11.     After requesting several extensions of time to complete its status review,

14  FWS published its 12-month finding in the Federal Register on February 25, 2010.  The

15  Service came to the same conclusion as it had in response to the Center's initial listing

16  petition, the same decision this Court later overturned—namely, that desert eagles are

17  not "significant" to the overall bald eagle population and thus do not qualify as a DPS

18  eligible for ESA protections.

19         12.     Upon concluding its status review and issuing its 12-month finding, the

20  Service moved this Court to dissolve the injunction against applying the final bald eagle

21  delisting rule. The Center opposed the Service's Motion to Dissolve and brought a

22  Cross-Motion to file a supplemental complaint. On September 30, 2010, the court ruled

23  in favor of the Service, dissolving its injunction and denying the Center's motion to

24  supplement its complaint. The case was assigned to Judge Campbell per his order.

25         13.     On October 4, 2010, the Center challenged the Service's February 25, 2010

26  12-month finding that desert eagles did not qualify as a DPS.  This Court granted

27  summary judgment to the Center on November 30, 2011, holding that the Service's 12-

28  month finding was arbitrary and capricious and remanding to the Service to generate a

1   lawful 12-month finding.  The court specifically ordered the Service to explain: (1)

2   "whether [the Service] has adopted a new interpretation of the DPS policy"; (2) whether

3   the desert eagle's adaptations to its unique environment demonstrate significance to the

4   overall bald eagle species; and (2) why the Service believes loss of the desert eagle

5   population would not result in a significant gap in the bald eagle's range. *Center for*

6   *Biological Diversity v. Salazar*, No. CV 10-2130-PHX-DGC, 2011 WL 6000497, at *16

7   (D. Ariz. Nov. 11, 2011) [hereinafter *CBD v. Salazar*].

8       14.     In response, FWS published another 12-month finding in the Federal

9   Register on May 1, 2012. The Service again reaches the same conclusion—that desert

10  eagles are not "significant" to the overall bald eagle population and thus do not qualify as

11  a DPS.  Additionally, although it concludes that desert eagles are not a DPS, the Service

12  nevertheless takes the highly unusual step of determining whether this population is

13  threatened or endangered under the ESA.  The Service portrays this highly unusual

14  procedure as providing "us and the public with valuable information for understanding

15  the status of the population." Endangered and Threatened Wildlife and Plants; 12-Month

16  Finding on a Petition To List the Sonoran Desert Area Bald Eagle as Threatened or

17  Endangered, 77 Fed. Reg. 25792, 25810 (May 1, 2012).  However, it is much more

18  likely that the Service undertook this costly and time-consuming process simply to create

19  another argument to avoid ESA protections for desert eagles—even if this Court again

20  finds the Service's DPS analysis arbitrary and capricious.  The Service's new 12-month

21  notice does not fully address the specific issues the court ordered the agency to address.

22      15.     This action seeks declaratory and injunctive relief overturning the

23  Service's renewed negative 12-month finding for the desert eagle DPS, overturning the

24  Service's negative endangerment finding, and compelling the Service to immediately

25  begin a new, lawful DPS review.

26                  **JURISDICTION AND VENUE**

27      16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

28  (federal question), 28 U.S.C. § 1346 (United States as a defendant), 16 U.S.C. §§

---

COMPLAINT

5

1540(c) & (g) (action arising under the Endangered Species Act and citizen suit provision), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

17.     This Court has authority to grant the requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

18.     As required by the Endangered Species Act ("ESA"), the Center provided the Secretary with written notice of intent to sue more than 60 days ago.  ESA § 11(g)(2), 16 U.S.C. § 1540(g)(2).  Because the Secretary has not remedied the violations of law, there exists an actual controversy between the parties within the meaning of the Declaratory Judgment Act.  28 U.S.C. § 2201.

19.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e) and ESA § 11(g)(3)(A), 16 U.S.C. § 1540(g)(3)(A).  The desert eagle lives in this judicial district, a substantial part of the events giving rise to the cause of action occurred in this judicial district, and defendants maintain an office in this judicial district.

## PARTIES

20.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit corporation with over 39,000 members and offices in Joshua Tree, Los Angeles, and San Francisco, California; Washington, D.C.; Portland, Oregon; Tucson and Phoenix, Arizona; and Silver City, New Mexico.  The Center is dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands.  The Center's members and/or staff use and enjoy, and intend to continue to use and enjoy, lands where the desert eagle is found for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and/or staff have researched, studied, and observed the desert eagle and intend to research, study, and observe the species in the future.  Defendants' ESA violations facilitate the decline of this species and its habitat. Therefore, the Center's members and/or staff's educational, scientific, aesthetic, spiritual, professional, and conservation

interests are being adversely affected and irreparably injured by the Service's continued violations of the Endangered Species Act.  The Center brings this suit on its own behalf and on behalf of its adversely affected members and staff.

21.     Plaintiff MARICOPA AUDUBON SOCIETY ("MAS") is a non-profit organization dedicated to the enjoyment of birds and other wildlife with a primary focus on the protection and restoration of the habitat of the Southwest through fellowship, education and community involvement.  MAS is a chapter of the National Audubon Society.  MAS has over 2300 members, primarily in central Arizona.  MAS, a co-petitioner for ESA listing of the desert eagle, has undertaken continuous ongoing activist efforts to protect eagle habitats of the arid Southwest.  MAS has played a strong role in protecting endangered species in the Southwest through public education efforts, field surveys, public field trips, and, position papers.  MAS leads field trips with members and non-members of the public to habitat areas of the desert eagle.  MAS brings this action on behalf of itself and its adversely affected members.  Defendants' ESA violations facilitate the decline of this species and its habitat.  Accordingly, the educational, scientific, aesthetic, conservation and recreational interests of MAS's members and staff have been, are being, and unless the Court grants the requested relief, will continue to be adversely affected and irreparably injured by Defendants' inaction and failure to comply with the law.

22.     Defendant KENNETH SALAZAR is the Secretary of the Interior ("Secretary").  The Secretary is the federal official charged with listing species as endangered or threatened under the ESA.  She is sued in her official capacity.  The Secretary has delegated his obligation to review listing petitions under the ESA to the U.S. Fish and Wildlife Service.

23.     Defendant  DAN ASHE is the Director of the U.S. Fish and Wildlife Service ("the Service") and has been delegated responsibility for implementing the ESA including proposed and final listing and critical habitat decisions and the handling of petitions for such listings.

## **THE ENDANGERED SPECIES ACT**

24.     The ESA is a federal statute designed to conserve endangered and threatened species and the ecosystems upon which those species depend.  ESA § 2(b), 16 U.S.C. § 1531(b).

25.     To achieve these objectives, the Service is required to protect such imperiled species by listing them as either "threatened" or "endangered" if they are facing extinction due to any one, or any combination of, the following factors:

(A)     the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)     over-utilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

ESA § 4(a)(1), 16 U.S.C. § 1533(a)(1).

26.     A species is "endangered" if it is "in danger of extinction throughout all or a significant portion of its range."  ESA § 3(6), 16 U.S.C. § 1532(6).  A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  ESA § 3(20), 16 U.S.C.  § 1532(20).

27.     Under the ESA, a species is explicitly defined to include "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." ESA § 3(16), 16 U.S.C. § 1532(16) (emphasis added).

28.     Three elements are considered by FWS in a decision regarding the status of a possible distinct population segment ("DPS") as endangered or threatened under the

Act: discreteness of the population segment in relation to the remainder of the species to which it belongs; the significance of the population segment to the species to which it belongs; and the population segment's conservation status in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?). *See Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4722 (February 7, 1996).

29.    A population segment of a vertebrate species may be considered discrete if it satisfies either one of the following conditions:  it is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors (quantitative measures of genetic or morphological discontinuity may provide evidence of this separation); or it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.  *Id*.

30.    A population segment of a vertebrate species may be considered significant if it satisfies any of the following:  persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon; evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics; or other evidence of significance ("because precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment").  *Id*.

31.    If a population segment is discrete and significant (i.e., it is a distinct population segment), its evaluation for endangered or threatened status will be based on

the ESA's definitions of those terms and a review of the factors enumerated in section 4(a) of the ESA.  *Id.*

32.   A species receives mandatory substantive protections under the Endangered Species Act if and only if it is listed as endangered or threatened.  Thus, the listing process is the essential first step in the ESA's system of species protection and recovery.

33.   Any interested person can begin the listing process by filing a petition to list a species with the Secretary.  ESA § 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a)(2005).

34.   Upon receipt of a petition to list a species, the Secretary has 90 days to the maximum extent practicable to make a finding as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  ESA § 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1). This determination is known as a 90-day finding.

35.   If the Secretary makes a positive 90-day finding, he must promptly publish it in the Federal Register and commence a "status review" of the species.  ESA § 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A).  A status review enables the agency to do a complete assessment of the status of a species, with input from interested members of the public and the scientific community, and determine whether a population qualifies as a DPS and whether it is facing extinction.

36.   After issuing a positive 90-day finding, the Secretary has 12 months from the date that he received the petition to make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but presently precluded by work on other pending proposals for listing species of higher priority.  ESA § 4(b)(3)(B), 16 § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).

37.   If the Secretary finds that listing the species is warranted, he must publish a

1    proposed rule to list the species as endangered or threatened in the Federal Register.

2    ESA § 4(b)(5), 16 U.S.C. § 1533(b)(5).

3         38.    Within one year of the publication of a proposed rule to list a species, the

4    Secretary must make a final decision on the proposal.  ESA § 4(b)(6)(A), 16 U.S.C. §

5    1533(b)(6)(A).

6         39.    Along with a final listing determination, the Service must issue a final

7    decision regarding the designation of critical habitat for the species to the maximum

8    extent prudent and determinable.  ESA § 4(a)(3) & ESA § 4(b)(6)(C), 16 U.S.C. §§

9    1533(a)(3) & 1533(b)(6)(C).

10

11                              **DESERT EAGLES**

12        40.    The desert eagle distinguishes itself from other bald eagle populations in

13   several important respects:  1) it persists in a unique desert ecological setting (the

14   Sonoran Desert riparian areas of central Arizona and northwestern Mexico); 2) it is a

15   peripheral population that lives on the edge of the bald eagle's range; 3) it is smaller than

16   other bald eagles; 4) it possesses behavioral distinctions such as cliff nesting and early

17   season breeding; and 5) it is reproductively isolated, and likely genetically distinct, from

18   other bald eagle populations.

19        41.    The desert eagle population has been considered "unique" for over 30

20   years.  The Service itself has pointed out that "this population occupies a southwest

21   desert habitat not found elsewhere and utilizes nest sites unique to the species in the

22   contiguous United States."  *See e.g.* Nomination for Critical Habitat Determination –

23   Bald Eagle Nesting in Southwestern United States, Memorandum from Regional

24   Director, Region 2 (SE) to Director, USFWS, Washington, D.C. (OES) (September 7,

25   1978).

26        42.    Moreover, as the Service has likewise stated, "20 years of monitoring have

27   resulted in the determination that no eagles have immigrated to and only one eagle has

28   emigrated from the [desert] bald eagle population."  *See* Petition to List the Sonoran

Desert Population of the Bald Eagle as a Distinct Population Segment, List that Distinct Population Segment as Endangered, and Designate Critical Habitat, 71 Fed. Reg. 51549, 51554 (August 30, 2006).

43.     In fact, the desert eagle is so behaviorally distinct and reproductively isolated that "should [its] population experience a rapid decline, there are few eagles in neighboring southwestern states or Mexico which could serve as a source population," and "a decision to release [bald eagles] into Arizona from elsewhere should be considered only as a last resort, as the introduction of foreign genes…might disrupt co-adapted gene complexes specific to the [desert eagle]." 71 Fed. Reg. at 51553.

44.     While the estimated desert eagle population has increased modestly, the makeup of this population and its decreasing productivity suggests that desert eagles still remain at serious risk of extinction.  Subadults are present in extremely high numbers in the breeding pairs (evidence of high adult mortality), and fledgling mortality is likewise excessive.

45.     The desert eagle faces numerous threats to its habitat.  Most significantly, the riparian ecosystems on which desert eagles critically rely for existence are in sharp decline.  The Southwest has already lost about 90% of its historical riparian communities, and the remaining riparian areas are declining due to increased human development, dewatering of riparian streams, effects of cattle grazing, recreational disturbance, mining, a declining prey base, toxic pollution, global climate change, and lack of native vegetation-rejuvenating floods causing a loss of riparian trees and snags used for breeding.  Population growth in and around desert eagle habitat exacerbates these impacts.  Maricopa County is expected to see its population double to 6 million people and cities along the Verde River such as Cottonwood and Camp Verde are expected to triple their population in the next several decades. This population growth causes substantial ecosystem pressures of increased development, water use and recreational impacts.  Dam projects and stream diversions, coupled with excessive

1  ground water mining in drought-prone areas cause degradation and loss of riparian

2  communities, and adverse impacts and local extirpation of aquatic flora and fauna.

3       46.     Moreover, because fish found in riparian systems are the primary food

4  source for the desert eagle, the desert eagle faces substantial threats with native fish

5  decline.  The native fishery with which the desert eagle evolved suffers substantial

6  decline for many of the same reasons desert eagles are in decline – loss of riparian

7  habitat.  Of the 20 native fish of the Gila River Basin, one is extinct, six are extirpated,

8  nine are listed as threatened or endangered, and nine of the ten others merit greater

9  protection.  Despite these threats to the desert eagle food source, exotic fish continue to

10  be introduced to native fish habitat.

11       47.     Not only does the desert eagle face significant threats, its current small

12  population size and reproductive isolation make it extremely vulnerable to loss of genetic

13  variability,[1] which in turn limits the population's options for adaptation to changing

14  environmental conditions such as global warming.

15

16                    **THE PETITION TO LIST THE DESERT EAGLE DPS**

17       48.     On October 6, 2004, Plaintiffs filed a Petition asking the Service to

18  designate desert eagles as a distinct population segment ("DPS") and to list the DPS as

19  an endangered species under the ESA.  The Petition also requested that the Service

20  designate critical habitat for the desert eagle DPS.

21       49.     The ESA mandates that the Secretary of the Interior, to the maximum

22  extent practicable, make an initial finding as to whether a petitioned action may be

23  warranted within 90 days after receiving a listing petition ("90-day finding").

24  Accordingly, the desert eagle 90-day finding was due on or about January 11, 2005.

25

26

27

28  [1]    With a small population, the loss of just one eagle can mean the loss of an entire
gene which can mean the loss of an entire genetic adaptation.

50. Because the Service failed to issue a 90-day finding more than one year after the desert eagle Petition was submitted, the Center brought suit against the Service. The Parties reached a settlement in which the Service agreed to issue a 90-day finding by August 23, 2006.

51. On August 30, 2006, FWS' 90-day finding was published in the Federal Register and concluded that the Center's Petition did not present substantial information that desert eagles qualify as a DPS.  The Service also concluded that desert eagles, if they qualified as a DPS, were not threatened or endangered.

52. While acknowledging that desert eagles are "discrete" from other bald eagle populations, the 90-day finding nonetheless concluded that the desert eagle population was not "significant" enough to warrant listing as a DPS.  In making this determination, the Service reversed over 30 years of findings, including its own, regarding the unique nature of desert eagles.

53. The 90-day finding also concluded that the threats to the desert eagle were insignificant.  The Service simply stated that it believes "awareness, collaboration, flexibility, planning, and willingness of all wildlife, land, and recreation managers" will obviate the threats, and that other voluntary or otherwise unenforceable measures will adequately protect the eagle. 71 Fed. Reg. at 51556–60.

54. The 90-day finding did not analyze whether the desert eagle population itself is endangered, threatened, or recovered; indeed, the Service currently lacks the tools to perform such an analysis because it has failed to develop (for a recovered population) or to update (for a threatened population) criteria for determining when the desert eagle population and habitat have attained these status milestones.  The Service insinuated in the 90-day finding that the current number of desert eagles is adequate because it is greater than previous population numbers.  However, the Service failed to provide an explanation as to why the number of eagles currently present in this reproductively isolated population is sufficient to constitute a secure population. Population viability studies, on the other hand, including ones presented in the Petition,

1    show that the desert eagle is likely to go extinct in approximately 75 years.

2

3    **THE SUIT AGAINST FWS CHALLENGING ITS 90-DAY FINDING**

4    55.    Plaintiffs sent a sixty-day notice of intent to sue to the Secretary and

5    Service on November 2, 2006, satisfying statutory notice requirements.

6    56.    On March 6, 2008, this Court noted that a number of FWS biologists

7    believed that desert eagles may be "significant" to the overall bald eagle population –

8    one of the key criteria for finding the desert eagles are a DPS.  *CBD v. Kempthorne*,

9    2008 WL 659822, at *11.  However, FWS officials at the regional and national levels of

10   the agency determined that the listing petition should be denied, summarily reversing the

11   biological findings of its agency experts and issued "marching orders" to biologists, who

12   noted in a conference call that "[w]e've been given an answer now we need to find an

13   analysis that works."  *Id*.  Upon reviewing FWS' actions, this Court found the agency's

14   decision "to exemplify arbitrary and capricious agency action."  *Id*.  The court's March

15   6, 2008 Order provides yet another illustration that FWS's program remains mired in

16   dysfunction and ethical morass documented by two Interior Department Inspector

17   General reports.  *See* Office of Inspector General, U.S. Department of Interior,

18   Investigative Report: The Endangered Species Act and the Conflict Between Science and

19   Policy (2008); Office of Inspector General, U.S. Department of Interior, Investigative

20   Report: Allegations Against Julie McDonald, Deputy Assistant Secretary, Fish, Wildlife,

21   and Parks (2007) [*hereinafter* "DOI Report"].  These reports concluded that Julie

22   MacDonald, Former Deputy Assistant Secretary of U.S. Fish and Wildlife Service

23   improperly imposed her policy agenda by heavily reshaping the scientific reports

24   prepared by field biologists, despite her complete lack of background in biological

25   sciences.  This resulted in several legally indefensible determinations by the FWS that

26   required science-based support, yet were corrupted by MacDonald and other officials'

27   political agendas.   The report also found that MacDonald improperly disclosed non-

28   public information to private sector industry representatives.

57.     Asserting that it had "no confidence in the objectivity of the agency's decision-making process," this Court, in its March 6, 2008 order, set aside FWS' determination that desert eagles were not eligible for protection under the ESA and ordered the agency to conduct a status review of the population. *CBD v. Kempthorne*, 2008 WL 659822, at \*14.  This Court also granted injunctive relief to protect desert eagles during the period of time required to complete the court-ordered status review. Pointing to the "many threats" facing desert eagles, the Court emphasized that it was "not willing to risk the continued vitality of the Desert bald eagle pending the FWS' lawful determination of whether listing the Desert eagle as a DPS is warranted, and if so, whether the Desert eagle DPS should continue to receive ESA protections."  *Id*. at \*15. Accordingly, this Court enjoined FWS from removing desert eagles from the list of threatened species until "FWS makes a lawful determination of their status as a DPS." *Id*.

## FWS' ACTIONS ON FIRST REMAND

58.     After almost 18 months of analysis and evaluation of information gained from comments of interested experts, tribes, and members of the public, the biologists in FWS' Region 2 developed a draft 12-month finding concluding that desert eagles are "significant" to the species of bald eagles as a whole and thus are eligible for listing as a DPS. In a detailed memorandum to the assistant Director of FWS in Washington, D.C. dated August 24, 2009, the Regional Director of FWS' Region 2 office, Benjamin Tuggle, noted that the region was preparing a draft finding concluding that desert eagles are eligible for listing as a DPS due to "the uniqueness of the Sonoran Desert ecological setting and its significance to the species."  The memo to headquarters provided detailed findings to support this conclusion.

59.     In its August 24, 2009 memorandum, Region 2 Director Tuggle also expressed concern that the Washington office was adding unwarranted elements to the DPS Policy that could affect the determination of desert eagles' listing eligibility. Tuggle rejected the Washington office's interpretation of the DPS Policy as inconsistent

with the longstanding interpretation of the policy and even inconsistent with one of the DPS authors' statements of the intention of the policy.  Tuggle noted that the Washington office incorrectly applies the DPS policy when it requires demonstration that the desert eagle population adapted evolutionarily to the unique ecological setting in order to support a finding of "significance."   Tuggle relies on statements made by agency solicitors and even one of the co-authors of the DPS Policy itself, confirming in a conference call that "it was not the intention of the [DPS] policy, when written, to require evidence of evolutionary adaptations," and that such evidence "is not required by the policy."

60.     In requiring evidence of evolutionary adaptations to support conclusions of "significance to the taxon as a whole," the Washington office completely reversed its longstanding interpretation of its DPS policy.  It is particularly instructive (and disturbing) that this "evolutionary significance" factor was also previously employed by FWS in its politically-based negative 90-day finding that this Court found arbitrary and illegal. A Department of Interior Inspector General report into improper political influence in ESA listing decisions noted the role of this factor in FWS' initial finding that desert eagles are not "significant":

> On July 18, 2006, Mary Richardson [of the FWS Arizona Office] participated in a telephonic conference concerning the southwestern bald eagle with [Chris] Nolin and [Doug] Krofta from the FWS Washington Office. Richardson stated that during the call, Nolin and Krofta discussed a negative finding on the discreteness prong, yet Richardson and other field personnel suggested that the finding could instead possibly be positive. Richardson said that when significance was discussed, Krofta and Nolin stated that [Ren] Lohoefener wanted to apply an evolutionary standard to the significance prong. Richardson objected stating that this standard was not a part of the FWS DPS Policy. When she asked them to identify an instance when this standard had been used in the past, Krofta and Nolin responded by stating that this was the *first time* it had ever been applied.

DOI Report at 48 (emphasis added). Tuggle's memo, coupled with this report, shows that a primary line of reasoning upon which the new 12-month finding relies to find that

1    desert eagles are not "significant" is the *same* rationale initially created by the agency in

2    its improper efforts to avoid protecting these birds.

3         61.   Moreover, prior to this arbitrary and unexplained reversal of interpretation

4    to its DPS policy, the FWS listed both the North American Green Sturgeon and the

5    Mountain Yellow Legged Frog as Distinct Population Segments based solely on the

6    populations' persistence in unique ecosystems.  The Service did not impose any

7    overarching requirement for evolutionary adaptations for a finding of significance to the

8    taxon as a whole.

9         62.   In a letter dated December 4, 2009, nearly two years after this Court

10   ordered the Service to reconsider its initial decision on desert eagles and only a few

11   weeks before the Court's extended deadline for a new finding, the FWS Assistant

12   Director provided a one-page response to the detailed Region 2 memo. The response

13   rejected the region's concern that the Service had modified its interpretation of its DPS

14   policy, and did not address any of the regional office's biological findings.  The

15   Assistant Director also informed the regional office that he had made a decision that "the

16   best data currently available also supports a conclusion that this population [of desert

17   eagles] is not a valid DPS."  Finally, he instructed the region that his "staff will work

18   with [the regional office] on development of the revised version of the finding," clearly

19   signaling that the Washington office would step in to help re-write the then-draft positive

20   12-month finding to reach the opposite conclusion.

21        63.   After requesting several extensions of time to complete its status review,

22   the Service published its final negative 12-month finding in the Federal Register on

23   February 25, 2010.  After nearly two years of analysis, the new finding reached a

24   conclusion identical to that made by the agency in response to the Center's initial listing

25   petition and later overturned by this Court – namely that desert eagles are not

26   "significant" to the overall bald eagle population and thus do not qualify as a DPS

27   eligible for protection under the ESA.  The Service's final negative 12-month finding

28   ignored biological information developed by regional biologists and instead came to key

conclusions exactly opposite those of Service biologists who had worked on this Court's remand for nearly a year and a half.  For example, the Service reached inconsistent conclusions with its own biologists on the significance of the adaptations to cliff nesting; on its contributions to the taxon as a whole based on its adaptations signifying resiliency of the population; and on its ability to persist in hot, arid environments in the face of predicted increasing temperatures and aridity resulting from climate change.

64.     This 12-month finding was contrary to the Center's Petition, the Service's files, and the scientific and legal conclusions reached by the Service's state and regional offices after nearly a year and a half of status review.  The Petition and files provide substantial evidence supporting the desert eagle's significance to the entire bald eagle population due to the population's peripheral location, its unique behavioral adaptations, its morphological and genetic characteristics, and its reproductive isolation.

65.     On February 24, 2010, the Service moved this Court to dissolve its injunction preventing the application of the final delisting rule to the desert eagle population.  The Center also moved this Court to allow a Supplemental Complaint to include the Center's subsequent challenges to the Service's new 12 month finding.

66.     On September 30, 2010, this Court granted the Service's Motion to Dissolve the Injunction that enjoined the final application of the bald eagle delisting rule for all bald eagle populations. This Court also declined to grant the Center's Motion to Supplement the Complaint, finding that the substance of the Service's 12 month finding is more appropriately reviewed in a new, separate action.

67.     The Service took the position that desert eagles were delisted the moment the court issued its order dissolving the injunction.  It asserted that a Federal Register notice does not operate to delist the species, but merely provided notice of the delisting to the public. Thus, under the Service's view, desert eagles were immediately without the habitat and other protections the ESA provides.

## THE SUIT AGAINST FWS CHALLENGING ITS 12-MONTH FINDING

68.     On June 6, 2010, Plaintiffs sent a sixty-day notice of intent to sue to the Secretary, satisfying the statutory notice requirements.

69.     On October 4, 2010, the Center challenged the Service's February 25, 2010 12-month finding that the bald eagles nesting in the Sonoran Desert area did not qualify as a DPS.  Plaintiffs alleged that FWS and the Department of Interior violated the ESA and APA in issuing the 12-month finding.

70.     On November 30, 2011, this court granted summary judgment to the Center, holding that the Service's 12-month finding was arbitrary and capricious and remanding to the Service to generate a lawful 12-month finding.  This Court found the Service's 12-month finding to be improperly based on its own 2007 delisting rule, which had failed to comport with legal notice, comment, and consultation requirements.  *Center for Biological Diversity v. Salazar*, No. CV 10-2130-PHX-DGC, 2011 WL 6000497, at *15 (D. Az. Nov. 30, 2011) [hereinafter *CBD v. Salazar*].  The Service relied on the 2007 delisting rule to determine that desert eagles were not a DPS despite overwhelming evidence to the contrary: virtually unanimous comments from biologists that the desert eagle should be accorded DPS status, and conclusions from Arizona-based FWS scientists and the FWS Region 2 Director that the desert eagle warranted DPS status.  *Id*. at *12–13.

71.     Consequently, the Service's de facto reliance on the 2007 delisting rule, as well as the resulting conclusion that the desert eagle population was discrete but not significant to the taxon as a whole, were unlawful.  *Id*. at *15.  De facto reliance on a procedure that "flies in the face" of legal requirements was improper and essentially allowed "an invalid status review to trump a valid statuts review."  *Id*. at *14 (citing *CBD v. Kempthorne*, 2008 WL 659822, at *11).

72.     This Court additionally found that the Service was not open to new information about the desert eagle, that it made the 2007 delisting decision in an environment where "Washington's 'policy call' resulted in 'marching orders' for the Service's scientists in Arizona," and that FWS internal communications "'appear to

1   exemplify arbitrary and capricious action.'" *Id*. at *14–15 (quoting *CBD v. Kempthorne*,

2   2008 WL 659822, at *11).

3         73.    Accordingly, this Court set aside the Service's 12-month finding as an

4   abuse of discretion, not in accordance with law, and not "founded on a rational

5   connection between the facts found and choices made" *Id.* at *15 (quoting *Ariz. Cattle*

6   *Growers Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001)).  This Court

7   ordered that FWS complete a new 12-month finding.  *Id*.

8         74.    This Court further ordered that FWS address in its new finding whether it

9   had adopted a new interpretation of the DPS policy that required additional proof of

10   significance beyond the standard showing that a population segment persists in a unique

11   ecological setting.  If the FWS did adopt a new interpretation, FWS was required to

12   delineate the reasons for and validity of the change.  *Id*. at *16

13         75.    Finally, this Court made clear that the Service should provide in its new

14   finding a reasoned explanation as to why loss of  desert eagles would not result in a

15   significant gap in the range of  bald eagles generally, and why desert eagle adaptations

16   do not demonstrate significance to the bald eagle taxon as a whole (if an additional

17   showing of significance is required). *Id*. at 1*6.

18

19   **FWS' ACTIONS ON SECOND REMAND**

20         76.    In response to the November 2011 court order, the Service published its

21   second negative 12-month finding in the Federal Register on May 1, 2012.  The new

22   finding reaches a conclusion identical to that made by the agency in response to the

23   Center's initial listing petition (later overturned by this Court) and identical to the initial

24   12-month finding (later overturned by this Court)—namely that desert eagles are not

25   "significant" to the overall bald eagle population and thus do not qualify as a DPS

26   eligible for protection under the ESA.  Additionally, the Service determined that even if

27   desert eagles were eligible for listing as a DPS, the population's conservation status is

28   such that it does not warrant listing as threatened or endangered.

77.     The new 12-month finding once again runs contrary to the Center's Petition, the Service's files, and the scientific and legal conclusions reached by the Service's state and regional offices after nearly a year and a half of status review.  The Petition and agency files provide substantial evidence supporting the desert eagle's significance to the entire bald eagle population due to a) the unique ecosystem inhabited by desert eagles;  b) the likelihood that loss of  desert eagles would result in a significant gap in the bald eagle's range; c)  desert eagles' unique behavioral and genetic adaptations to their ecosystem; d) desert eagles'  unique morphological and genetic characteristics; and e) desert eagles'  reproductive isolation from other eagles populations.

78.     The agency ignored the findings of its own regional biologists, again illegally applied its DPS policy, failed to use the best available science, and failed to set forth a rational connection between the facts found by the agency and its determinations that desert eagles are neither eligible for listing as a DPS, nor threatened or endangered as the ESA defines those terms.

## FIRST CLAIM FOR RELIEF

### (FWS' Failure to Rely on the Best Scientific and Commercial Data)

79.     Each of the allegations set forth above is incorporated by reference herein.

80.     When making a listing determination pursuant to the ESA, the Service must rely on the best scientific and commercial data available.  ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).

81.     The Service's new negative 12-month finding regarding the significance of desert eagles shares defects with its prior similar decision.  In the Service's prior negative 12-month finding for desert eagles, the Service ignored or discounted information, including findings from its own regional biologists, that desert eagles persist in an ecological setting unique for the taxon; that loss of the desert eagle population would result in a significant gap in the range of the species; that desert eagles differ

markedly from other populations of the species in their genetic characteristics; and that desert eagles are significant due to their morphological and behavioral characteristics as well as their reproductive isolation.

82.     The Service's new 12-month finding carries forward these same defects. For example, the Service's prior 12-month finding ignored certain studies by Allison, Meffe, and Tieleman.  This Court's most recent order required the Service to consider these studies.  *CBD v. Salazar,* 2011 WL 6000497, at *10.  However, the Service failed to do so, once again ignoring important scientific evidence.  The Service thus failed to use the best scientific information available in assessing whether desert eagles constitute a distinct population segment under the ESA.

83.     By ignoring or discounting the best available scientific information,  as well as selectively choosing from its files which information to rely on, or not rely on, in assessing the desert eagle's designation as a DPS, the Service violated the ESA's requirement that the agency base its listing determinations on the best scientific and commercial data available.  ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).  As a result, the agency's desert eagle 12-month finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. § 706(2).


## SECOND CLAIM FOR RELIEF
### (Improper DPS Analysis)

84.     Each of the allegations set forth above is incorporated by reference herein.

85.     The FWS' DPS analysis is improper and arbitrary in two ways. First, the Service finds that desert eagles are not a significant population despite its own scientific evidence that the desert eagle population meets at least three DPS policy significance factors. This conclusion is premised on several errors: improperly requiring that the population demonstrate evolutionary adaptation to its unique ecosystem; improperly relying on flawed reasoning to determine that loss of the desert eagle population would

not result in a significant gap in the range of the overall taxon; and improperly ignoring scientific evidence that the DPS differs genetically from other populations of the species. The Service's finding is arbitrary because it fails to articulate a rational connection between the evidence on record and its finding that desert eagles are not significance to the bald eagle taxon. Next, the DPS analysis is improper and arbitrary because, even if the agency may apply the evolutionary adaptation standard to its significance analysis, the desert eagle population exhibits such adaptation.

**a. Desert eagles are significant because they meet three DPS Policy significance factors and thus are significant to the bald eagle taxon as a whole.**

86.     The desert eagle population warrants a significance determination because: it is a discrete population segment persisting in an ecological setting unusual or unique for its taxon; the population's extirpation would result in a significant gap in the overall range of the bald eagle taxon; and the population is genetically unique from other populations of the species. Further, the desert eagle population is significant as compared to the bald eagle taxon as a whole. The Service's DPS analysis in its 12-month finding is improper and arbitrary because the 12-month finding is in contravention to the plain language of the policy and is not rationally related to the evidence available to the agency.

87.     The desert eagle population warrants a positive significance determination because it is a discrete population segment persisting in an ecological setting unusual or unique for its taxon. Desert eagles comprise the only bald eagle population in the United States to persist in a desert ecosystem.  Despite substantial evidence indicating that desert eagles, unlike any other population of bald eagles, occupy and have adapted to a desert environment, the Service in its new 12-month finding ignores the biological findings of its field experts, and concludes instead that "while the Sonoran Desert Area represents a unique set of habitat characteristics, persistence of that population of bald eagles among those habitat characteristics is not significant (i.e. biologically or ecologically important) to the taxon as a whole."  77 Fed. Reg. at 25808. This finding is

arbitrary. The Service's conclusion is not rationally related to information available to the agency.

88.     For over thirty years, the Service has considered desert eagles to be a unique population. Such a finding is unremarkable given the fact that these eagles comprise the only bald eagle population in the United States to persist in a desert ecosystem.  More precisely, because of their long persistence in, and adaptation to, a hot, dry, desert environment, desert eagles display unique adaptations to that environment, namely early season breeding, use of cliffs as nesting sites, smaller sizes than other bald eagles, and other characteristics.  In its 12-month finding, the Service finds that scientific evidence that nesting habitats in Arizona are "among the most unusual nesting habitats occupied by the species" to "on its face, suggest[] that the Sonoran Desert Area is an ecological setting that is unusual or unique for the species." 77 Fed. Reg. at 25806.

89.     Despite this abundant evidence, and the Service's own longstanding views, the Service takes a new, additional step. It weighs desert eagle adaptation to this unique ecosystem as evidence of the population's significance to the bald eagle taxon as a whole. The Service ultimately makes a "no significance" finding based largely upon the agency's new evolutionary adaptation standard. This finding is arbitrary, flies in the face of the plain language of the DPS Policy, and is in contravention to the agency's own statement that "[t]he DPS Policy does not require evidence of adaptation to a unique or unusual ecological setting." *Id*. The Service's DPS Policy explicitly provides that "[p]ersistence of the discrete population segment in an ecological setting unusual or unique for the taxon," qualifies the population as significant. 61 Fed. Reg. at 4722. This policy was written by the agency to specifically incorporate the congressional directive that DPS's be recognized "sparingly." 77 Fed. Reg. at 25798. The agency's own scientific evidence demonstrates desert eagle significance based upon the plain language of the DPS Policy. Thus, there should be no question that desert eagles are significant.

90.     The desert eagle population also warrants a significance determination because the population's extirpation would result in a significant gap in the overall range

of the taxon. The Service's renewed determination that loss of the desert eagle

population would not result in such a gap is arbitrary. It relies on the very same flawed

reasoning the Service used in its prior, unlawful 12-month finding.  The Service reasoned

both times that the small size of the desert eagle population in comparison with the entire

species means that the extirpation of desert eagles would not result in a significant gap in

the overall species' range.  75 Fed. Reg. at 8619; 77 Fed. Reg. at 25809. This reasoning

is biologically flawed, contradicts the Service's own biological determinations, and is

inconsistent with Ninth Circuit precedent.  *See Nat'l Ass'n of Home Builders v. Norton*,

340 F.3d 835, 846 (9th Cir. 2003) ("Even the loss of a peripheral population, however

small, would create an empty geographic space in the range of the taxon. *Regardless of

the size* of such a gap, a gap would exist.") (emphasis added).

91.     Moreover, the Service's mere echoing of its prior inadequate reasoning

fails to comply with this Court's most recent holding, which required the Service to offer

a reasoned explanation for its finding that extirpation of desert eagles would not result in

a significant gap in the range of the overall taxon.  *See CBD v. Salazar*, 2011 WL

6000497, at *9.

92.     The desert eagle population also warrants a significance determination

because the population is genetically unique from other populations of the species. The

Service's determination that the desert eagle population is not genetically unique is

arbitrary because the agency relies on flawed data and fails to consider the conclusions

of its own scientists in making this determination.

93.     First, the Service fails to rationally connect the available evidence to its

ultimate conclusion when it relies on two studies deemed to be insufficient and of

questionable reliability by their very authors. The authors called into question the

sampling procedures, small sample size, and the limited number of genetic loci examined

in the study. Despite this, the Service relies on these studies to conclude that the desert

eagle population does not possess genetic characteristics markedly different from other

bald eagles, and is therefore not significant. This conclusion is arbitrary because there is

1   no rational connection between the questionable validity of the studies and the Service's

2   firm reliance on their findings.

3         94.    Next, the Service fails to consider the best scientific evidence available to

4   the agency. The Service fails to consider here a relevant study cited elsewhere in the 12-

5   month finding. That population-specific study discusses the genetic significance of the

6   desert eagles' small size to its population and provides evidence of the population's

7   genetic adaptation to its environment. 77 Fed. Reg. at 25807. The Service fails to

8   consider its own biological findings of the desert eagle's overwhelming preference for

9   cliff-nesting. *Id.* at 25808 (Noting that Alaskan bald eagles ground nest 10 percent of the

10  time, but failing to contrast this service biologist conclusions that desert eagles prefer

11  cliff nests 73 percent of the time). The Service fails to discuss genetically controlled

12  migratory pathways in juvenile desert eagles that provide evidence of the population's

13  genetic adaptation to its environment. 77 Fed. Reg. at 25808. The Service's conclusion

14  relies on flawed data and is not rationally related to the information available to the

15  agency and fails to consider the best scientific evidence available to the agency. Thus,

16  the Service's conclusion that the desert eagle population is not genetically unique is

17  arbitrary and not rationally related to the facts available to the agency.

18        95.    Finally, in completing its DPS analysis, the service fails to consider

19  evidence contained in the Center's Petition and FWS files demonstrating the desert

20  eagle's significance to the entire bald eagle population due to the population's peripheral

21  location, its unique behavioral adaptations, its morphological and genetic characteristics,

22  and its reproductive isolation.

23        96.    The Service's conclusion that desert eagles are not "significant" to the bald

24  eagle population as a whole and therefore do not qualify as a DPS is not rationally

25  related to the evidence available to the agency.  As a result, FWS' conclusion in its 12-

26  month finding on the Center's Petition that desert eagles do not constitute a DPS is

27  arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the

28  ESA within the meaning of the APA.  5 U.S.C. § 706(2).

**b. Even if FWS requires evidence of adaptation to warrant a significance finding, desert eagles exhibit sufficient adaptations to meet this standard.**

97.    Because of their long persistence in, and adaptation to, a hot, dry, desert environment, desert eagles display unique adaptations to that environment. These include early season breeding, use of cliffs as nesting sites, smaller sizes than other bald eagles, and differences in eggshell porosity, among others. In its assessment of these adaptations, the Service summarily and improperly dismisses scientific evidence substantiating the desert eagle's unique adaptations to its environment.

98.    For example, the agency purportedly discredits a *population-specific* study discussing the genetic significance of the desert eagles' small size to its population. The service relies instead on a study outlining general differences in bald eagle size, but provides no rational basis for relying on generalized, rather than population-specific information. 77 Fed. Reg. at 25807.

99.    Similarly, the Service declines to draw conclusions from a study demonstrating an adaptation based upon eggshell porosity. The agency does not consider the study, dismissing it as not "scientifically robust" because of its small sample size. *Id.* This dismissal is in notable contrast to the agency's later reliance, in its genetics assessment, on studies deemed by their own authors to be questionable based on their small sample sizes.

100.    Similarly, the Service fails to articulate a rational connection between science showing adaptation via desert eagles' cliff-nesting preferences and its conclusion that this behavior does not demonstrate a population-specific adaptation. The agency specifically omits from its analysis its own significant biological finding that desert eagles select cliff nests 73 percent of the time. *Id.* at 25811. Instead, the agency outlines other types of areas bald eagles "may" nest and finds it important to specifically note that Alaskan bald eagles ground nest up to 10 percent of the time. *Id.* at 25808. The agency ignores its own biological facts and relies instead on the species' general "flexibility" to account for the unique desert eagle population behavior.

101.     Similarly, the Service fails to articulate a rational connection between evidence showing adaptation via genetically controlled migratory pathways and the agency's conclusion that this behavior does not demonstrate a population-specific adaptation.  The agency outlines a study finding that individually-migrating juvenile desert eagles demonstrate characteristics similar to those of a migrating group. Id. The study finds that this evinces genetic control of migration for this population. *Id.* However, the service again dismisses the species-specific study and relies instead on the species' general "flexibility" and species-wide group migration patterns that do not account for the unique desert eagle population behavior. *Id.*

102.     The Service's conclusion that desert eagles have not demonstrated evidence of adaptation to a unique ecological setting—and are therefore are not "significant" to the bald eagle population as a whole, and therefore not a DPS—is not rationally related to the information available to the agency.  The agency fails to rely on the best available scientific evidence and fails to rationally connect its evidence to its conclusion, because instead of conducting a proper, neutral analysis, the Service cherry picks the scientific evidence that supports its pre-ordained conclusion and disregards or dismisses the rest.  As a result, the Service's conclusion in its 12-month finding on the Center's Petition that desert eagles do not constitute a DPS is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
### (Arbitrary Application of the DPS Policy)

103.     Each of the allegations set forth above is incorporated by reference herein.

104.     Under the ESA, a species is explicitly defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  ESA § 3(16), 16 U.S.C. § 1532(16) (emphasis added).

105.    The Service's statutory authority under § 3(16) of the ESA to list a species population as a distinct population segment (DPS) does not require any evidence of evolutionary adaptations to unique ecosystems.

106.    Further, no regulations exist in the Code of Federal Regulations interpreting the statutory term "distinct population segment."

107.    The Service issued its DPS Policy on February 7, 1996.  Neither the text of the DPS Policy nor any prior application has required a showing of evolutionary adaptation to unique ecosystems in order to establish "significance" to a taxon as a whole.

108.    The Service's application of an evolutionary adaptation standard to the desert eagle "significance" findings is arbitrary and capricious because this standard is a change to the policy, heightens the existing DPS Policy standards, and was implemented illegally, without using required notice-and-comment rulemaking procedures.

109.    Despite the plain language of the Service's DPS policy, its long-standing application of the policy, and its failure to follow proper procedures, the Service illegally changed DPS policy by requiring a showing of a population's evolutionary adaptation to establish "significance" to its taxon as a whole.

110.    The Service first relied on the evolutionary adaptation standard as part of its initial 90-day finding. DOI Report at 48 (noting FWS' Washington employees explicitly acknowledging the negative finding as the first time the standard was applied). This court found that 90-day finding to be arbitrary and illegal.

111.    The Service next improperly relied on the evolutionary adaptation standard in its initial 12-month finding to conclude that desert eagles were not significant and did not warrant a DPS listing.  This Court set aside that 12-month finding as an abuse of discretion, not in accordance with the law, and lacking a rational connection between the facts found and choices made.

112.    The Service again improperly relies on the evolutionary adaptation

1  standard in its second 12-month finding to again conclude that desert eagles are not

2  significant and do not warrant a DPS listing.

3      113.    Prior to these findings, the Service had never required evidence of

4  evolutionary adaptation to a population's unique surroundings to substantiate a DPS

5  finding. Yet in each of its findings relating to desert eagles, the service applies the

6  evolutionary adaptation standard to determine that the population is not significant, and

7  thus not eligible for listing as a DPS. The Service's application of the evolutionary

8  adaptation standard is arbitrary and capricious because it represents a DPS Policy change

9  and was implemented without required notice-and-comment rulemaking.

10     114.    This Court required the Service to address whether its new application of

11  the DPS policy, applying an evolutionary adaptation standard, is a revision of the DPS

12  policy. In its new 12-month finding, the Service states that its approach "is consistent

13  with the Service's prior interpretations of the DPS policy, and, as such, the Service has

14  not adopted a new interpretation of the DPS policy."  77 Fed. Reg. at 25808.

15     115.    However, this statement stands alone, without any explanation of the

16  purported consistency with precedent or even a citation to any purportedly consistent

17  prior application.  The lack of such a citation is unsurprising because this is the first time

18  that the agency has applied this standard in its significance analysis. The Service has

19  failed to explain its claim that its application of the evolutionary adaptation standard in

20  this case is consistent with precedent, because the approach is in fact novel.

21     116.    While the Service may, of course, change the DPS policy, it may only do

22  so through the proper notice-and-comment procedure—not in the ad hoc manner it has

23  used here.

24     117.    In once again requiring evidence of evolutionary adaptation to a unique

25  ecological setting, the Service has unlawfully interpreted the ESA and its own DPS

26  Policy. Therefore, the Service's misapplication of both the ESA's definition of "species"

27  and the Service's own DPS policy is arbitrary, capricious, an abuse of discretion, and

28

otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF

### (Threat Finding's Failure to Rely on Best Scientific and Commercial Data)

118.    Each of the allegations set forth above is incorporated by reference herein.

119.    When making a listing determination pursuant to the ESA, the Service must rely on the best scientific and commercial data available.  ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).

120.    The Service's conclusion that desert eagles are not threatened or endangered fails to rely on the best scientific and commercial data available in two ways. First, the Service fails to consider threats to the desert eagle deriving solely from its small population size. Second, the Service fails to consider important scientific information about climate change that was available when the Service made its finding.

121.    The Service's finding fails to consider threats from the desert eagle's small population size.  FWS places considerable emphasis on desert eagles' increase in population to a total of 48 pairs in 2009. 77 Fed. Reg. at 25795, 25809.  However, a population with only 48 pairs is a relatively tiny population, and it thus faces a severe risk of extinction as a result of demographic, stochastic, and catastrophic factors even if it is slowly increasing its numbers.  The vulnerability of small populations is well-documented in the scientific literature and even in conservation biology textbooks. *E.g.* Russell Lande, *Genetics and Demography in Biological Conservation*, 241 *Science*

1455, 1459 (1988) (noting that "[f]uture conservation plans should incorporate both

demography and population genetics in assessing the requirements for species

survival"); Andrew S. Pullin, *Conservation Biology* 86, 210 (2002) (noting that "four

factors are thought to increase the probability of extinction in small populations relative

to large ones" and discussing how to calculate a "minimum viable population size").  In

effect, the Service passes judgment that the existing size and growth rate of the desert

eagle population are sufficient to prevent extinction.  However, it does so without

considering a factor that scientists have long suggested is an important factor in

assessing a population's likelihood of extirpation.   *E.g.* Lande, *supra*, at 1459.  The

Service thus fails to rely on the best scientific and commercial data available.

122.    The Service also fails to consider available scientific evidence about the

effects of climate change in the desert eagle's habitat. Although the Service does

consider some scientific evidence about climate change, it concludes that "climate

change is not a significant threat" because the effects of climate change on desert eagles

are "unclear." 77 Fed. Reg. at 25826. However, this determination reflects the Service's

utter failure to consider a significant portion of the scientific literature examining the

effects of climate change in Arizona and the Southwest.  For example, the Service

discusses a report from 2008 by the U.S. Climate Change Science Program, *id.*, but it

fails to consider a similar, but more recent report by the U.S. Global Change Research

Program. U.S. Global Change Research Program, *Global Climate Change Impacts in the*

*United States* (Thomas R. Karl, Jerry M. Melillo, and Thomas C. Peterson, eds.,

Cambridge Univ. Press 2009). Similarly, the Service fails to discuss any of the eight

articles that the Proceedings of the National Academy of Sciences published in December of 2010 in a special feature on "Climate Change and Water in Southwestern North America." *See* 107 PNAS 21256–305 (Dec. 14, 2010), *available at* http://www.pnas.org/cgi/collection/climate_change_sw. Additionally the Service fails to consider any evidence from the University of Arizona's Climate Assessment for the Southwest. That scholarly organization publishes monthly a "Southwest Climate Outlook," which the Service also fails to consider.  Among many relevant articles in that publication is one from March of 2007, reporting that the IPCC has concluded climate change is "unequivocal." The article quotes a climatologist from the University of Arizona as saying that "the Southwest—Southern California into Texas—will probably be one of the hardest and soonest hit parts of the country." Stephanie Doster, CLIMAS, *Southwest Climate Outlook* 4 (March 2007), *available at* http://www.climas.arizona.edu/feature-articles/march-2007-Doster. By failing to consider any of this evidence, the Service has missed any clarity that these scientific resources can add to the analysis. Accordingly, the Service's uncertainty about climate change threats is not based on the best scientific evidence.

123.    Even if the effects of climate change are unclear, the Service still fails to base its conclusion on the best available science because it fails to consider scientific information regarding decision-making  in the face of  uncertainty about the impacts of climate change. The Service simply assumes that uncertainty about climate change's effects means that climate change is not a significant threat to desert eagles. 77 Fed. Reg. at 25826. However, this facile approach does not  consider the recommendations made

by the U.S. Climate Change Science Program (CCSP) in its "Best Practice Approaches for Characterizing, Communicating, and Incorporating Scientific Uncertainty in Decisionmaking." That work recommends formulating environmental management strategies that are resilient to, and that can adapt to, climate change. M. Granger Morgan et al., CCSP, *Best Practice Approaches for Characterizing, Communicating, and Incorporating Scientific Uncertainty in Decisionmaking* 57–67 (2009), *available at* http://downloads.globalchange.gov/sap/sap5-2/sap5-2-final-report-all.pdf. Nowhere does that work recommend discounting threats from climate change merely because of scientific uncertainty, as the Service has done here. While the Service may not necessarily be bound by these best practices, it should nonetheless have considered them in assessing the effects of climate change on desert eagles' conservation status. Because the Service instead fails to consider this guidance on how to incorporate scientific uncertainty into its decision, the Service's ultimate conclusion that desert eagles are not threatened or endangered is not based on the best available scientific and commercial data available. ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A). Accordingly, the Service's finding of no threat or endangerment is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

## **FIFTH CLAIM FOR RELIEF**

### **(Threat Finding's Failure to Rationally Connect Evidence to Conclusions)**

124.    Each of the allegations set forth above is incorporated by reference herein.

125.     When making a listing determination pursuant to the ESA, the Service must rely on the best scientific and commercial data available.  ESA § 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A).

126.     When reviewing the Service's listing decisions, courts must "hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Under this standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action *including a rational connection between the facts found and the choice made*." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 563 U.S. 29, 43 (1983) (emphasis added).

127.     The Service's conclusion that the desert eagle is not threatened or endangered is arbitrary and capricious because the Service fails to articulate a rational connection between the facts it found and the conclusion it made. There are several instances of such arbitrary failures of reason. First, the Service fails to rationally connect demographic models demonstrating the desert eagle's likelihood of going extinct to the ultimate conclusion that desert eagles are not threatened or endangered. Second, the Service fails to rationally connect its finding that desert eagles are reacting negatively to each documented threat to the ultimate conclusion that desert eagles are not threatened or endangered even by the cumulative action of these threats. Third, the Service fails to rationally connect its conclusion that existing regulatory mechanisms adequately protect golden eagles to the regulations' actual provisions, which fail to protect habitat critical to the desert eagle's survival.

128.    The record before the Service includes a demographic model concluding that the desert eagle population is likely to decline and eventually be lost. 77 Fed. Reg. at 25820–21. Additionally, the record includes a demographic model that could not conclude that the desert eagle's population is stable. *Id.* at 25821. The Service, however, recalculates these demographic models, which were constructed by independent experts, simply because the experts have different estimates than the Service for desert eagles' likelihood of persistence. *Id.* The Service entirely fails to consider whether desert eagles would be threatened or endangered if the experts and their demographic models are correct. Instead, the Service tinkers with the scientific models in order to reach a pre-ordained conclusion. The Service's doctored viability modeling is inappropriately based on: (1) unfounded assumptions regarding juvenile/sub-adult survivorship; (2) acceptance of an unexplained discrepancy between demographic and population count trends; and (3) a failure to include any objective measure of bias in fitted survival rates. Because the Service thus fails to articulate a rational connection between the record and its ultimate conclusion, the Service's conclusion that desert eagles are not threatened or endangered is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA within the meaning of the APA.

129.    Similarly, the Service fails to articulate a rational connection between an important finding—that "[w]ith respect to each kind of threat [to the desert eagle], the best available information has confirmed a response to the threat, such as a decrease in breeding rates or survival rates"—and its ultimate conclusion that desert eagles are not threatened or endangered. 77 Fed. Reg. at 25828. The information before the Service

indicates that threats to desert eagles are causing them to die more and breed less. *Id.* Additionally, the information before the Service indicates that desert eagle habitats and food supplies are dwindling. *Id*. Finally, the information before the Service indicates that desert eagles very seldom interbreed or intermingle with bald eagles outside the Sonoran desert. *Id.* at 25804.

130.    The Service nonetheless concludes that these threats, even when considered in combination, do not sufficiently imperil the desert eagle to merit listing it as threatened or endangered. To reach this conclusion, the Service relies on a study's "simple counts" of desert eagles for the proposition that more birds are breeding each year—but fails to note that that study itself concluded that it lacked sufficient data to determine if desert eagle populations are stable. *Id.* at 25821.  Additionally, the Service relies on its finding that desert eagle survivor, mortality, occupancy, and productivity demographic rates are within the range of values reported for other bald eagle populations. *Id.* at 25828. This reasoning has two flaws. First, the Service's analyses for each demographic rate are themselves logically flawed. For example, the Service discounts a finding of higher mortality among desert eagle nestlings because it believes this finding to be the result of "more intensive monitoring and consequently better detection," *id.* at 25821, but the Service fails to apply similar reasoning to a study that intensively counted breeding pairs to report that the breeding rate of desert eagles has been increasing. *Id.* This example illustrates how the Service has tailored its findings on desert eagle demography to fit rates reported for other bald eagles.

131.    The second flaw in the Service's reasoning is that the Service fails to

fulfill its duty to "evaluate whether . . . combined potential threats present a significant threat to the Sonoran Desert Area bald eagle population." *Id.* at 25828.  Rather than actually analyze how these multifarious threats work in conjunction, the Service simply assumes that if they were working in conjunction, its prior analysis would reveal cumulative effects.  *Id.*  In other words, it assumes that its reasoning for individual threats is sufficient to reveal cumulative threats as well.  This approach renders null the ESA's requirement that the Service consider combined potential threats.

132.    Because the Service offers only a logically flawed analysis that fails to actually consider combined potential threats, the Service fails to articulate a rational connection between its finding that there are many threats acting on desert eagles and its ultimate conclusion that desert eagles are not threatened or endangered. Thus, the Service's ultimate conclusion that desert eagles are not threatened or endangered is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA within the meaning of the APA.  5 U.S.C. § 706(2).

133.    The Service also arbitrarily concludes in its new 12-month finding that the inadequacy of existing regulatory mechanisms does not contribute to desert eagles' risk of extinction.  77 Fed. Reg. at 25820.  FWS cites in particular the Bald and Golden Eagle Protection Act (BGEPA), including the statute's definition of "disturb" and recently promulgated incidental take allowances for bald and golden eagles. *See id*. at 25819-25820.  However, the BGEPA protects desert eagle habitat only if the habitat impacts will disturb specific eagles.  Moreover, while the BGEPA prohibits disturbance of individual eagles, it does not mandate any conservation activity that will help *recover*

the species.  *See* 16 U.S.C. § 1536(a)(1) (federal agencies "shall . . . utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species  . . .").  Losing any habitat protection is particularly dangerous for the small desert eagle population. *See CBD v. Kempthorne,* 2008 WL 659822, at *11 (noting that "FWS acknowledges [that the desert eagle population] can easily be cordoned off and is still particularly vulnerable to habitat threats").  FWS fails to address known ongoing, planned and increasing habitat threats and the fact that many nests are found in decadent, over-mature trees or snags with few available replacements. Because the BGEPA does not protect the habitat of desert eagles generally, focusing instead on specific birds, and because the desert eagle habitat does face perils, the Service fails to draw a rational connection between its review of existing regulatory mechanisms and its finding that the inadequacy of those regulatory mechanisms does not contribute to the desert eagle's likely extinction. Accordingly, the Service's ultimate conclusion that desert eagles are not threatened or endangered is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA within the meaning of the APA.

## PRAYER FOR RELIEF

Plaintiffs request that this Court enter judgment providing the following relief:

1.   Issue a Declaratory Judgment that Defendants are in violation of the law for each and every Count as alleged herein;

2.   Declare unlawful and set aside the Service's most recent negative 12-month finding on the status review for desert eagles;

3.      Enter an injunction compelling the Service to reconsider its  12-month finding that desert eagles are not "significant" and that the desert eagle population is not threatened or endangered, and compel the Service to promptly conduct a *lawful* full status review of the desert eagle population to determine whether it is threatened or endangered as defined in the Endangered Species Act;

4.      Award Plaintiffs their costs of litigation, including reasonable attorneys' fees as provided in the ESA, the Equal Access to Justice Act and/or any other applicable law; and

5.      Award Plaintiffs any other such relief as the Court deems just and proper.

Respectfully submitted this 30th day of October, 2012,


**/S/ Daniel J Rohlf**


Daniel J. Rohlf

Counsel for Plaintiffs