**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Center for Biological Diversity, et al.,

            Plaintiffs,

v.

Sally Jewell, et al.,

            Defendants.

No. CV-12-02296-PHX-DGC

**ORDER**

This case involves Plaintiffs' attempts to have the Sonoran Desert population of bald eagles listed as threatened or endangered under the Endangered Species Act. This population of the bald eagle, which will be referred to in this order as the "desert eagle," has been the subject of two previous lawsuits in this Court. *See Ctr. For Biological Diversity v. Kempthorne*, 2008 WL 659822 (D. Ariz. Mar. 6, 2008); *Ctr. For Biological Diversity v. Salazar*, 2011 WL 6000497 (D. Ariz. Nov. 30, 2011). Plaintiffs challenge the decision of the Fish and Wildlife Service that the desert eagle is not a distinct population segment under the Endangered Species Act.

The parties have filed cross motions for summary judgment. Docs. 30, 63. The motions are fully briefed (Docs. 63, 66, 68), and the Court heard oral argument on October 10, 2014. The Court will grant summary judgment for Defendants.

## I.  Background.

The Endangered Species Act ("ESA") defines "species" to include "any distinct population segment of any species of vertebrate fish or wildlife[.]" 16 U.S.C. § 1532(16).

1    The Fish and Wildlife Service ("FWS") is an agency charged with determining when a
2    portion of a species constitutes a distinct population segment ("DPS").

3          The bald eagle was first listed as an endangered species on March 11, 1967.  The
4    listing occurred under the Endangered Species Preservation Act of 1966, a predecessor to
5    the ESA.  Following enactment of the ESA in 1973, the bald eagle was listed as
6    endangered in 43 states and threatened in 5 others.  43 Fed. Reg. 6230 (Feb. 14, 1978).
7    On July 12, 1995, the bald eagle was reclassified as threatened in all states.  60 Fed. Reg.
8    36000.

9          The bald eagle is an ESA success story.  Under the protection of the ESA, bald
10   eagle numbers increased significantly throughout the United States from less than 500
11   breeding pairs in 1963 to almost 10,000 breeding pairs in 2007.  72 Fed. Reg. 37346.  As
12   a result this remarkable recovery, FWS removed the bald eagle from the threatened
13   species list in 2007.

14         In 2004, as delisting was being considered, the Center for Biological Diversity
15   ("CBD") filed a petition asking FWS to designate the desert eagle as a DPS and provide
16   for its continued protection under the ESA.  Upon receiving such petitions, FWS must
17   issue a 90-day finding on whether the "petition presents substantial scientific or
18   commercial information indicating that the petitioned action may be warranted."  16
19   U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b).  After some delay and litigation, FWS
20   found that CBD's petition did not "present substantial scientific or commercial
21   information to indicate that the Sonoran Desert bald eagle constitutes a valid DPS."  71
22   Fed. Reg. 51549 at 51556 (Aug. 30, 2006).

23         CBD challenged the finding in this Court, and in 2008 Judge Mary H. Murguia set
24   aside the finding as arbitrary and capricious under the Administrative Procedures Act
25   ("APA").  *Ctr. For Biological Diversity v. Kempthorne*, 2008 WL 659822 (D. Ariz. Mar.
26   6, 2008).  Judge Murguia stated that she had "no confidence in the objectivity of the
27   agency's decision making process" due, in part, to evidence that FWS officials in
28   Washington, D.C. had given "marching orders" to local FWS personnel that the petition

1    was to be denied.  *Id*. at *12.  Judge Murguia remanded the petition to FWS with orders

2    to conduct a full status review and issue a finding on whether the desert eagle constituted

3    a DPS.  *Id* at *15-16.

4              After additional public comment and review, FWS issued its finding in February

5    2010.  75 Fed. Reg. 8601-01 (Feb. 25, 2010).  FWS found that the desert eagle population

6    was not a DPS eligible for listing under the ESA.  *Id.*  Plaintiffs challenged this new

7    finding in this Court, and the undersigned judge set it aside.  *See Ctr. for Biological*

8    *Diversity v. Salazar*, 2011 WL 6000497, at *14 (D. Ariz. Nov. 30, 2011).  The Court held

9    that the finding was based on a 2007 delisting procedure and rule that "failed to comport

10   with the notice, comment, and consultation requirements of the law."  *Id*. at *9.  The

11   Court found the finding to be an abuse of discretion and ordered FWS to complete a new

12   finding based on information gathered during the status review ordered by Judge

13   Murguia.  *Id* at *14.

14             FWS issued its new finding on May 1, 2012, again finding that the desert eagle is

15   not a DPS (the "2012 Finding").  77 Fed. Reg. 25792-01 (May 1, 2012).  FWS also found

16   that desert eagles are not threatened or endangered.  *Id* at 25828.   In this lawsuit,

17   Plaintiffs claim that the 2012 Finding, like FWS's previous actions on the desert eagle, is

18   arbitrary and capricious.

19   **II.      DPS Policy and the 2012 Finding.**

20             FWS has issued a formal policy on how DPS decisions are to be made (the "DPS

21   Policy").  The DPS Policy reflects Congressional guidance that DPS designations should

22   be used "sparingly" while "encouraging the conservation of genetic diversity."  61 Fed.

23   Reg. 4725.  The policy requires FWS to evaluate three elements in deciding whether a

24   portion of a species constitutes a DPS entitled to protection under the ESA – discreteness,

25   significance, and conservation status.  61 Fed. Reg. at 4725.

26             A population satisfies the first element – discreteness – if it is "markedly separated

27   from other populations of the same taxon" by "physical, physiological, ecological, or

28   behavioral factors," or if it is "delimited by international boundaries within which

differences [in species management] exist that are significant."[1]  *Id*.  The 2012 Finding found the desert eagle population to be discrete because it is physically separated from other populations of bald eagles and because there is little or no immigration to and emigration from the surrounding populations.  77 Fed. Reg. at 25801-05.  Plaintiffs agree with this finding and do not challenge it in this case.

In assessing the second element – significance – the DPS Policy requires FWS to "consider available scientific evidence of the discrete population segment's importance to the taxon to which it belongs."  61 Fed. Reg. at 4725.  The DPS Policy identifies four factors to be considered in evaluating the significance of a population: (1) persistence of the population in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the population would result in a significant gap in the range of a taxon; (3) evidence that the population represents the only surviving natural occurrence of a taxon; and (4) evidence that the population differs markedly from other populations of the species in its genetic characteristics.  *Id*.  The DPS Policy makes clear that these factors are not exclusive.  *Id*.  The policy further instructs that "[b]ecause precise circumstances are likely to vary considerably from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment."  *Id*.

In applying the first significance factor – "persistence of the population in an ecological setting that is unusual or unique for the taxon" – the 2012 Finding considered the broad variety of settings in which bald eagles live:

> Bald eagles are highly adaptable, wide-ranging habitat generalists.  Across the range of the species, there is no "usual" ecological setting, in terms of the elevation, temperature, prey species, nest tree species, or type of water source[.]  The bald eagle is capable of inhabiting areas throughout North America, so long as a sufficient food source persists.

77 Fed. Reg. at 25806.

_____

[1] A "taxon" is a taxonomic category, such as a species.  *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 798 (9th Cir. 2008).

The 2012 Finding provided additional detail to support its conclusion that the bald eagle is a "habitat generalist" that can survive almost anywhere.  It noted that the bald eagle is distributed across the North American continent, "from the Aleutian Islands to Baja California, Mexico, and from northeastern Canada to Florida."  *Id.*  It found that the bald eagle "breeds at elevations ranging from sea level to mountains as high as 10,000 feet," and occupies a wide range of aridity including "some of the driest areas in the United States and . . . some of the wettest."  *Id.*  The 2012 Finding noted that although bald eagles generally nest in trees along rivers, lakes, and seacoasts in proximity to a sufficient source of prey, they have also been documented to nest on cliffs, on the ground, in mangroves, in caves, and in man-made structures such as cell-phone towers.  Bald eagles are not limited to eating any particular species of or even class of prey.  *Id.*

Because the bald eagle lives in such a wide range of settings, FWS concluded that it could not find the desert eagle significant to the species as a whole merely because it lives in the desert.  "Though the Sonoran Desert Area may represent a unique set of habitat characteristics, we cannot say it is unusual or unique for the bald eagle such that persistence there is significant to the bald eagle species as a whole."  *Id.*

To determine whether the desert eagle is significant to the species as a whole, FWS asked whether it has adapted in ways that could benefit the species in times of stress or catastrophic loss.  *Id.* at 25806-07.  For example, FWS considered the relatively small size of the desert eagle, but found no evidence that its size resulted from a unique adaptation to the desert.  *Id*.  FWS instead found that its size was likely due to the latitude at which it lives.  *Id.* at 25807.  FWS cited studies showing that bald eagle size generally increases with more northerly latitudes, "consistent with Bergmann's Rule, which holds that animal size increases with increasing latitude due to changes in climate."  *Id.*  FWS noted studies finding that bald eagles in Florida, which is farther south than Arizona, are the smallest, and that their size decreases from north to south within the State of Florida.  *Id.*  FWS thus concluded that "small size is not an adaptation unique to the Sonoran Desert but is rather part of the natural variability of the taxon as a whole."  *Id.*

FWS considered the porosity of the desert eagle's egg shells, a factor cited by some in arguing that the desert eagle has adapted uniquely to the hot desert environment. FWS found only one study that addressed egg shell porosity – a 1992 study by Hunt *et al*. The study did not draw any conclusions about the significance of porosity and was based on an extremely small sample size of only four eggs. *Id.*  FWS concluded that "it would not be scientifically robust to draw any conclusions" from such a limited study. *Id.*

FWS examined differences in life history traits of the desert eagle, including the timing of breeding, feeding habits, nest-site selection, and juvenile migration. *Id.* at 25807-08. As with size, however, studies reviewed by FWS suggested that variations were likely due to differences in latitude. *Id.* For example, "the breeding chronology of Florida birds (further south than the Sonoran Desert Area eagles) is even earlier than those in the Sonoran Desert." *Id.* at 25807.

On the basis of this analysis, FWS concluded that persistence of the desert eagle in the Sonoran Desert did not support a finding that the desert eagle is significant to the bald eagle species as a whole. As FWS explained: "the combination of a highly adaptable species persisting in a varied habitat base leads us to conclude that the particular variations displayed in the Sonoran Desert Area population do not make that population more ecologically or biologically important[.]" *Id.* at 25808.

Turning to the second significance factor – "evidence that loss of the population segment would result in a significant gap in the range of the taxon" – FWS concluded that a significant gap would not occur. *Id.* at 25809. FWS found that the desert eagle does not represent a significant percentage of the total number of bald eagles, and that "the actual amount of suitable bald eagle habitat in the Sonoran Desert Area is in general limited and represents a minute fraction of the total suitable habitat for bald eagles throughout their range." *Id.* Further, FWS found that "the Sonoran Desert Area itself does not play any particular role in the life history of the bald eagle[.]" *Id.* Consequently, FWS found that the loss of eagles in the Sonoran Desert Area would not represent a significant gap in the range of the bald eagle as a whole. *Id.*

1    Applying the third significance factor, FWS found no evidence that the desert

2    eagle "represents the only surviving natural occurrence of a taxon that may be more

3    abundant elsewhere as an introduced population outside its historic range." *Id.* On the

4    fourth factor, FWS found no evidence that desert eagles have genetic characteristics that

5    are markedly different from other bald eagles. *Id.* at 25809-10. Plaintiffs do not

6    challenge these third- or fourth-factor determinations.

7    On the basis of these findings, the 2012 Finding concluded that the desert eagle

8    does not constitute a DPS. FWS nonetheless proceeded to evaluate the conservation

9    status of the desert eagle, finding that it is not threatened or endangered. *Id.* at 25810-27.

10   Plaintiffs challenge the finding's application of the first and second significance factors

11   and its conclusion that the desert eagle is not endangered or threatened.

12   **III.    Legal Standard.**

13   The APA governs judicial review of administrative decisions involving the ESA.

14   *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1999).

15   "[S]ummary judgment is an appropriate mechanism for deciding the legal question of

16   whether the agency could reasonably have found the facts as it did." *Occidental Eng'g*

17   *Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 770 (9th Cir. 1985). The Court

18   must set aside a final, non-discretionary agency action that is arbitrary or capricious, an

19   abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A);

20   *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993).

21   An agency action is arbitrary and capricious "if the agency has relied on factors

22   which Congress has not intended it to consider, entirely failed to consider an important

23   aspect of the problem, offered an explanation for its decision that runs counter to the

24   evidence before the agency, or is so implausible that it could not be ascribed to a

25   difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S.*

26   *v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The Court must determine

27   whether the agency's decision is "founded on a rational connection between the facts

28   found and the choices made . . . and whether [the agency] has committed a clear error of

1    judgment." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1243

2    (9th Cir. 2001).  The Court's review must be "highly deferential, presuming the agency

3    action to be valid and . . . affirming the agency action if a reasonable basis exists for its

4    decision." *Kern Cnty. Farm Bureau v. Allen,* 450 F.3d 1072, 1076 (9th Cir. 2006)

5    (citation omitted).  At the same time, the Court "must not rubber-stamp . . . administrative

6    decisions  that  [are]  inconsistent  with  a  statutory  mandate  or  that  frustrate  the

7    congressional policy underlying a statute."  *Ocean Advocates v. U.S. Army Corps of

8    Eng'rs,* 402 F.3d 846, 859 (9th Cir. 2005) (internal quotations and citations omitted).

9    **IV.    Significance.**

10         Plaintiffs argue that the 2012 Finding's consideration of the second DPS element –

11   significance – is arbitrary and capricious for four reasons: (1) by considering the

12   adaptation of desert eagles to conditions in the Sonoran Desert in its evaluation of the

13   persistence factor, FWS improperly revised the DPS Policy and ignored the plain

14   language and past applications of the policy; (2) FWS failed to consider all relevant

15   evidence in its evaluation of the persistence factor; (3) FWS ignored science regarding

16   the importance of peripheral populations in its "significant gap" analysis; and (4) FWS

17   did not consider the impact of climate change on bald eagles.  The Court will address

18   each of these arguments separately.

19         **A.     Adherence to the DPS Policy.**

20         As noted above, the first factor identified in the DPS Policy for evaluating the

21   significance of a population to the species as a whole is the "[p]ersistence of the discrete

22   population segment in an ecological setting unusual or unique for the taxon."  61 Fed.

23   Reg. at 4725.  Plaintiffs argue that the 2012 Finding, by considering the extent to which

24   desert eagles have adapted to the desert environment, ignores the plain meaning of this

25   language and constitutes an unlawful change in its application.  Doc. 52 at 19-24.[2]  The

26   Court will address these two arguments separately.

27   _____

28         [2] Docket citations are to page numbers placed on the top of each page by the
     Court's CMECF system, not to numbers on the bottom of each page.

1              **1.      Plain Language of the DPS Policy.**

2              Plaintiffs argue that the plain language of this persistence factor should control – if

3     a population persists in an ecological setting that is unique or unusual for the species, this

4     factor is satisfied and supports a finding that the population is significant to the species as

5     a whole.  Plaintiffs argue that the 2012 Finding imposed an additional requirement not

6     found in the language of this factor when it analyzed the desert eagle's adaptation to the

7     desert environment.  Doc. 52 at 13-18.  Plaintiffs assert that this departure permitted FWS

8     to conclude that "bald eagle nesting habitats in Arizona are among the most unusual

9     nesting habitats occupied by the species," and yet still find the desert eagle not significant

10    to the species because it lacks identifiable adaptations.  Doc. 52 at 17.  Plaintiffs call this

11    "significance squared," and argue that it conflicts with the wording of the policy.  *Id.*

12            The Court does not find that the DPS Policy should be read as rigidly as Plaintiffs

13    suggest.   The policy does not state that a population is significant merely because it

14    persists in a unique ecological setting.   Persistence is one of four significance factors

15    identified in the policy, and the policy expressly states that the agency's analysis "may

16    include, but is not limited to" these factors.  61 Fed. Reg. at 4725.  Thus, the four factors,

17    including persistence in a unique setting, appear to be both optional ("may include") and

18    non-exclusive ("not limited to").  The DPS Policy further instructs that "[b]ecause precise

19    circumstances are likely to vary considerably from case to case, it is not possible to

20    describe prospectively all the classes of information that might bear on the biological and

21    ecological importance of a discrete population segment."  *Id.*  Rather than establishing

22    wooden criteria designed to control FWS's determination, the DPS Policy is expressly

23    flexible, permitting the agency to consider a variety of relevant factors, only some of

24    which are identified in the policy.

25            In addition, the stated purpose of the persistence inquiry is not simply to find a

26    population that persists in a unique setting, but to determine whether that population is

27    important to the species as a whole.   The policy directs that "[i]n carrying out this

28    examination, the Service will consider available scientific evidence of the discrete

population segment's importance to the taxon to which it belongs."  *Id.*

As FWS explained in the 2012 Finding, when a species exists across a wide range of unique ecological settings, as does the bald eagle, the fact that it persists in one particular location such as the Sonoran Desert says little about whether the population in that location is important to the species as a whole.  It may simply reflect the species' ability to exist almost anywhere.  FWS appropriately conducted a further inquiry in determining whether the desert eagle has developed attributes by its life in the desert that are important to the species as a whole.  This inquiry is consistent with the DPS Policy's expressly flexible approach and with the directive that FWS determine whether a particular population is important to the entire species.

Where a species is not widely dispersed in a variety of settings – where it is limited primarily to one setting – its persistence in another, different setting might by itself be significant to the species as a whole.  Loss of the species in that unique setting could leave the species with only one setting in which to survive, making it more vulnerable to catastrophic events.  Thus, there may well be DPS inquiries where adaptation is not relevant.  *See, e.g.,* 77 Fed. Reg. 25806 (contrasting the bald eagles' ability to thrive in a variety of settings "with a situation where a portion of the range of a particular species exhibits one set of similar habitat characteristics but the distinct population segment utilizes a different set of habitat characteristics.").  The DPS Policy's flexible approach allows the agency to consider these and other relevant factors when deciding if a particular population is important to the species as a whole.

In short, the Court does not agree that the 2012 Finding was inconsistent with the language of the DPS Policy.

### 2.     Did FWS Adopt a New Policy Interpretation?

Plaintiffs argue that the 2012 Finding effectively adds an adaptation requirement to the persistence factor of the DPS Policy.  They argue that this addition significantly changes the policy without appropriate public notice and comment.  Plaintiffs raised this issue in their earlier suit, and the undersigned directed FWS on remand to "address

1   whether it has adopted a new interpretation of the DPS Policy and, if so, the reasons for

2   and validity of the change."  *Ctr. for Biological Diversity*, 2011 WL 6000497, at *10.

3       As a result, FWS conducted a review of its previous DPS findings.  FWS noted

4   that some DPS evaluations have found that the subject population persisted in an unusual

5   or unique environmental setting and yet was not important to the species as a whole.

6   2012 AR 984.  Other DPS decisions found that a setting could be considered unique, but

7   FWS could find no adaptation to the environment that would make the population which

8   persists there important to the species as a whole.  These include a 2010 finding on the

9   mountain whitefish, a 2010 finding on the Upper Missouri River arctic grayling, and a

10  2011 decision on the Mohave fringe-toed lizard.  2012 AR 986.  FWS found that it

11  frequently has considered species that persist in a wide variety of environmental

12  conditions and has concluded that the persistence of such species in any particular unique

13  setting is not significant to the species as a whole.  These include a 2005 finding on the

14  Southern Rocky Mountain population of the boreal toad, a 2009 finding on the coaster

15  brook trout, a 2011 finding on the Lake Sammamish kokanee, and a 2011 finding on wild

16  plain bison.  2012 AR 987.  After reviewing these prior findings, FWS concluded:

17

18          The DPS Policy . . . does not mandate that the mere presence of
            unusual habitat characteristics means that the population is significant to
19          the taxon[.]  As articulated in previous determinations, we use the unusual
            or unique nature of the ecological setting as one consideration in evaluating
20          whether persistence of that population is significant to the conservation of
            the taxon as a whole.  Therefore, in applying the "unusual or unique
21          ecological setting" significance category in the DPS [P]olicy, we evaluate
            not only whether the population persists in an area with habitat
22          characteristics that are unusual or unique, but whether in the biological
            expertise of the agency, persistence of that population is significant to the
23          conservation of the taxon as a whole. . . . [W]e have considered
24          evolutionary and life-history adaptations to be potential indicators that
            persistence of that population is significant to the taxon.  This approach to
25          applying the "unusual or unique ecological setting" significance category
26          . . . gives meaning to all of the words in that significance category of the
            DPS [P]olicy, and it is in keeping with Congress's directive to use the
27          authority to list DPSs sparingly.
28

1   2012 AR 988.  This review by FWS demonstrated that consideration of the desert eagle's
2   adaptation to its new environment was not a new approach.

3       FWS also used the 2012 Finding to clarify that adaptation is not a mandatory
4   consideration in every persistence inquiry:  "The DPS Policy *does not require* evidence
5   of adaptation to a unique or unusual ecological setting in order to make a finding of
6   significance; however, direct evidence of adaptation to an ecological setting could be a
7   strong indication that persistence of the population segment in that ecological setting is
8   significant to the taxon as a whole."  77 Fed. Reg. 25806 (emphasis added).    FWS
9   explained that "this action is consistent with the Service's prior interpretations of the DPS
10  Policy, and, as such, the Service has not adopted a new interpretation of DPS Policy."  77
11  Fed. Reg. 25808.

12      FWS's review of prior DPS determinations and its clarifying statements in the
13  2012 Finding persuade the Court both that FWS has considered adaptation in the past and
14  that its consideration of that factor in the 2012 Finding did not constitute a change of the
15  DPS Policy.  Considering adaptation when evaluating a habitat generalist like the bald
16  eagle comports with the policy's flexible approach and with its directive that the agency
17  determine whether the population is important to the species as a whole.

18      Moreover, when an agency interprets its own policies, courts must defer to the
19  interpretation.  The Court defers to FWS's conclusion that the 2012 Finding is consistent
20  with prior DPS determinations and does not constitute a change of policy.  *California v.*
21  *F.C.C.*, 39 F. 3d 919, 925 (9th Cir. 1994) ("[A]n agency's interpretation of its own
22  policies and prior orders is entitled to deference.") (citing *California v. F.C.C.*, 905 F.2d
23  1217, 1230 (9th Cir. 1990)); *Nat'l Ass'n of Regulatory Utility Com'rs v. F.C.C.*, 746 F.
24  2d 1492, 1502 (D.C. Cir. 1984) (FCC's interpretation of its own policies and regulations
25  entitled to "great deference") (quoting *Washington Association for Television & Children*
26  *v. FCC,* 712 F.2d 677, 684–85 (D.C.Cir.1983)); *Adoma v. Univ. of Phoenix, Inc.*, 779 F.
27  Supp. 2d 1126, 1135 (E.D. Cal. 2011) ("[T]he [Department of Labor's] interpretation of
28  its own regulations through these [opinion] letters is given 'a high degree of deference'

1    unless plainly erroneous or inconsistent with the regulation") (*quoting Imada v. Hercules*,

2    138 F. 3d 1294, 1297 (9th Cir. 1998)).

3    　　　In arguing to the contrary, Plaintiffs point to a December 10, 2008 Investigative

4    Report by the Inspector General of the Department of the Interior ("IG Report").[3]   The

5    portions of the IG Report in the record suggest that the Inspector General investigated

6    whether the original DPS determination for the desert eagle, and other FWS decisions,

7    were politically influenced.   Doc. 32-2.   The report recounts a 2006 conference call

8    between FWS personnel in the regional and national offices concerning the desert eagle,

9    during which a participant reported that FWS Assistant Director for Endangered Species,

10   Ben Loenhoffer, wanted to apply an "evolutionary standard" to the significance analysis.

11   The report states that Mary Richardson, Region 2 Supervisory Fish and Wildlife

12   Biologist, objected and asserted that an evolutionary standard "was not a part of the FWS

13   distinct population segment policy."   Doc. 32-2 at 4.   She reportedly asked whether such

14   a standard had been used in the past, and was told by the Washington participants that

15   this would be the first time.   *Id.*   The IG Report states that Loenhoffer was later asked

16   about the statement attributed to him in the conference call – that an "evolutionary

17   standard" should be used – and Loenhoffer said he had no knowledge of it.   *Id.* at 7.   The

18   IG Report recounts these statements as part of its narrative, but makes no effort to

19   determine which of the statements is correct or what was meant by "evolutionary

20   standard."

21   　　　Plaintiffs cite several other internal FWS documents.   An edited page, apparently

22   from a 2009 internal memo, suggests that FWS adopted a "new" policy in May 2009

23   when it concluded that persistence in a unique ecological setting is not enough, and that

24   FWS must also find that that the population has adapted evolutionarily to the setting.

25   _____

26   　　　[3] The Court takes judicial notice of the IG Report.   The Court may take judicial
     notice of a fact that is not subject to reasonable dispute if it "can be accurately and readily
27   determined from sources whose accuracy cannot reasonably be questioned."   Fed. R.
     Evid. 201 (b)(2).   Reports prepared by administrative agencies are proper subjects of
28   judicial notice.   *Interstate Natural Gas Co. v. S. Cal. Gas Co.*, 209 F. 2d 380, 385 (9th
     Cir. 1953).

1    2010 AR 6045.  Plaintiffs cite statements from a different region of FWS regarding a

2    DPS decision on coaster brook trout to the same effect.  2010 AR 6228; *see also* 2010

3    AR 5992.  Plaintiffs also rely on an August 2009 memorandum from the Region 2

4    Director recommending that the desert eagle be found to be discrete and significant.

5    2010 AR 6680-82.  The memo suggests that the Washington office of FWS has stated

6    that for a population to be found significant "we *must* be able to demonstrate that the

7    population has adapted evolutionarily to the setting."  *Id.* at 6680 (emphasis added).  The

8    memo concludes:  "[i]f *absolute information* on evolutionary adaptation is required for a

9    finding of significance based on unique or unusual ecological settings, formal guidance to

10   that effect should be provided and we will reevaluate our draft findings as appropriate

11   and consistent with this new guidance."  *Id.* at 6682 (emphasis added).

12          The Court is not persuaded by Plaintiffs' argument.  The IG Report contains

13   somewhat conflicting, second-hand accounts of a statement supposedly made by

14   Assistant Director Loenhoffer, snippets of communications from other internal sources,

15   and comments on an apparent proposal that adaptation be made a mandatory part of the

16   persistence inquiry.  The 2012 Finding makes clear that such a mandatory requirement

17   has not been adopted by FWS, making the comments on any previously proposed

18   mandatory requirement irrelevant.  Moreover, the Court finds the FWS analysis on

19   remand to be a more thorough history of the application of the DPS Policy than can be

20   constructed from the various pieces of evidence cited by Plaintiffs.  The Court therefore

21   does not accept Plaintiffs' argument that the 2012 Finding constituted a new and

22   improper change of the DPS Policy or reflected the continuation of the "marching orders"

23   that Judge Murguia found improper.[4]

---

24
25          [4] The Court also notes that even if some of the statements cited by Plaintiffs can be
     viewed as inconsistent with the conclusions in the 2012 Finding, opinions of employees
26   within an agency are not controlling as to agency policy.  *U.S. v. Farley*, 11 F.3d 1385,
     1391 (7th Cir. 1993) ("The views of agency employees contained in intra-agency
27   documents are not, however, expressions of FTC policy….  Rather they are part of the
     exchange of ideas—the give and take—central to the formulation of such policy.")
28   (internal citations omitted); *Vons Companies, Inc. v. U.S.*, 51 Fed. Cl. 1, 21 (Fed. Claims
     2001) (courts should be "extraordinarily hesitant to attribute to the IRS or the Treasury
     Department interpretations of a revenue ruling made by individual IRS employees that

**B.      Failure to Consider All Evidence.**

Even if FWS's interpretation of the DPS Policy is correct and not a departure from previous interpretations, Plaintiffs argue that FWS failed to consider all appropriate evidence when it addressed the desert eagle's persistence in a unique environment. Specifically, Plaintiffs point to a 2009 memo in which FWS biologists suggested that "the bald eagle in the harsh environment of the Sonoran Desert Area may represent a resilient population, capable of withstanding catastrophes due to its unique adaptations, which benefits the taxon as a whole." 2010 AR 6682. This memo also asserted that the desert eagles' "persistence in the Sonoran Desert Area is valuable in that they may serve as a place of safe refuge following a catastrophic event that causes the decline of eagles elsewhere in their range." *Id*.

The 2009 memo cited by Plaintiffs asserts that the desert eagle may be "capable of withstanding catastrophes *due to its unique adaptations*." 2010 AR 6682. The memo then discusses several possible adaptations, including the desert eagle's breeding chronology and nesting locations. *Id.* at 6681-82. As shown above, these very adaptations, along with others, were addressed in detail in the 2012 Finding and were found not to be unique to the Sonoran Desert population of bald eagles. 77 Fed. Reg. at 25806-08. Although the 2009 memo also noted the high heat of the Sonoran Desert and the fact that the desert eagle population was one of five "strongholds" where bald eagles survived DDT use in the United States, the memo ultimately reflected an opinion, a judgment call, as to whether the desert eagle population is important to the bald eagle species as a whole. The Court cannot say that FWS acted arbitrarily and capriciously when it came to a different conclusion in the 2012 Finding, particularly in light of its careful inquiry into whether the desert eagle displayed adaptations that would render it uniquely important to bald eagles generally. Nor can the Court conclude that the very general assertions in the 2009 memo that the desert eagle is "resilient" or that the Sonoran Desert could constitute a "safe refuge" for bald eagles in the future render the

represent their personal views, rather than the official position of the agency.").

1    2012 Finding arbitrary and capricious.

2         A "diversity of opinion by local or lower-level agency representatives will not

3    preclude the agency from reaching a contrary decision, so long as the decision is not

4    arbitrary and capricious and is otherwise supported by the record." *WildEarth Guardians*

5    *v. Nat'l Park Serv.*, 703 F.3d 1178, 1186-87 (10th Cir. 2013); *see also Farley*, 11 F.3d at

6    1391; *Vons Companies,* 51 Fed. Cl. at 21.  Moreover, even if the 2009 memo could be

7    viewed as a different and earlier view within the agency, agencies are free to change

8    course on the basis of new evidence or reasoned analysis.  *Nat'l Assoc. of Home Builders*

9    *v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) (observing that "the fact that a

10   preliminary determination by a local agency representative is later overruled at a higher

11   level within the agency does not render the decision making process arbitrary and

12   capricious.").

13        **C.    Significant Gap Evidence.**

14        The second factor listed in the DPS Policy for determining whether a population

15   segment is significant to the species as a whole is whether "loss of the discrete population

16   segment would result in a significant gap in the range of a taxon."  61 Fed. Reg. at 4725.

17   FWS acknowledged in the 2012 Finding that loss of the desert eagle population would

18   create some gap in the range of the bald eagle, but concluded that the gap would not be

19   significant under the DPS Policy.  77 Fed. Reg. at 25808-10.

20        "For purposes of the gap in the range analysis, the term 'significant' has its

21   commonly understood meaning, which is 'important.'"  *Nw. Ecosystem Alliance v. U.S.*

22   *Fish & Wildlife Serv.*, 475 F.3d 1136, 1146 (9th Cir. 2007) (citing *Nat'l Ass'n of Home*

23   *Builders v. Norton,* 340 F.3d 835, 846 (9th Cir. 2003)) (internal quotes omitted).  There is

24   no guidance in the DPS Policy as to what makes a gap important, and "FWS has given

25   different reasons for the importance of gaps in various listing rules."  *Nat'l Ass'n of*

26   *Home Builders v. Norton*, 340 F.3d 835, 846 (9th Cir. 2003) (citing *DPS Policy,*

27   61 Fed. Reg. 4722-01 at 4725).  In *Home Builders*, for example, FWS said the gap was

28   significant because it would decrease the genetic variability of the taxon, reduce the

1    current range of the taxon, reduce the historic range of the taxon, and extirpate the taxon

2    from the United States.  *Id.*

3         In analyzing whether the gap created by loss of the desert eagle would be

4    significant, the 2012 Finding noted that the bald eagle population in the Sonoran Desert

5    Area is "neither numerous nor constitute[s] a significant percentage of the total number

6    of bald eagles throughout the range of the taxon."  77 Fed. Reg. at 25809.  In 2009, there

7    were 48 breeding pairs of desert eagles in Arizona, where most of the desert eagles

8    reside, which constituted less than one-half of one percent of the bald eagle breeding

9    pairs in the lower 48 states and "much less" than one-half of one percent of the breeding

10   pairs throughout the range of the species.  *Id.*

11        FWS found that loss of the desert eagle would create a gap in the range of the

12   taxon, particularly since studies have found little evidence of bald eagle immigration into

13   the Sonoran Desert Area, but FWS was unable to find evidence that "any gap created in

14   the range would be significant to the taxon as a whole."  *Id.*  This was due to the fact that

15   the number of desert eagles is not a significant percentage of bald eagles generally, there

16   is "no evidence of distinctive traits or genetic variations" that would be important to the

17   species as a whole, and the "actual amount of suitable bald eagle habitat in the Sonoran

18   Desert Area is in general limited and represents a minute fraction of the total suitable

19   habitat available for bald eagles throughout their range."  *Id.*

20        FWS also found that the Sonoran Desert does not play any particular role in the

21   life history of the species.  *Id.*  FWS noted that the Sonoran Desert "is not the sole

22   breeding or rearing location for bald eagles," nor is it "only one of two parts of the

23   species range such that loss of eagles in one part would result in a significant gap."  *Id.*

24        FWS reached this conclusion: "Having reviewed the best available scientific

25   information with respect to the biological or ecological significance of the [desert eagle],

26   we have determined that loss of eagles in the Sonoran Desert Area would not represent a

27   significant gap in the range of bald eagles as a whole."  *Id.*

28        Plaintiffs argue that FWS ignored several scientific studies regarding peripheral

1   populations.  Doc. 52 at 13.  Plaintiffs cite a 2009 draft desert eagle finding in which

2   FWS employees cited peripheral population studies and recommended that the desert

3   eagle be designated a DPS.  *Id.* at 14-16.  Plaintiffs argue that these studies are ignored in

4   the 2012 Finding, something an agency cannot do when making ESA listing decisions.

5   *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006).  Although it

6   is true that the 2012 Finding does not address all of the studies mentioned in the 2009

7   draft, a careful review of that 2009 draft persuades the Court that this does not render the

8   2012 Finding invalid under the APA.

9          The first peripheral population study mentioned in the 2009 draft is Lessica and

10  Allendorf, 1995, p. 754.  2012 AR 505.  The 2009 draft describes this study as indicating

11  "that peripheral populations are likely to occur in ecologically marginal or stressful

12  situations, and that *distinct traits* found in peripheral populations may be crucial to a

13  species, allowing adaptation to environmental change." *Id.* (emphasis added).  Thus, the

14  importance of the Lessica and Allendorf study is its suggestion that peripheral

15  populations may develop "distinct traits" that are important to the species as a whole.

16  This, of course, is precisely what the 2012 Finding considered in detail – whether the

17  desert eagle has developed distinct traits or adaptations that are important to the bald

18  eagle population as a whole.  FWS could find reliable evidence of none.  In its discussion

19  of the Lessica and Allendorf study, the 2009 draft mentioned egg characteristics

20  addressed in the Hunt study of 1992 (*id.*), but this is the same study FWS addressed in the

21  2012 Finding when it considered egg shell porosity (77 Fed. Reg. at 25807).  FWS found

22  that the Hunt study "did not reach any conclusions as to the significance this difference in

23  egg shell porosity may have to Arizona eagles," that it was based on "an extremely small

24  sample size of four eggs," and that no other reported studies have analyzed the

25  significance of the Hunt observations.  *Id.*  As a result, FWS concluded that "it would not

26  be scientifically robust to draw any conclusions from the Hunt *et al.* (1992) study."  *Id.*

27         The second peripheral population study cited in the 2009 draft is Vucetich and

28  Waite, 2003, p. 643-644.  2012 AR 506.  In discussing the study, the 2009 draft observed

1   "that peripheral and isolated populations may experience pressure at the genetic level

2   favoring development of a *specific trait* rather than a variety of traits."  *Id.* (emphasis

3   added).  The examples of such possible traits mentioned in the 2009 draft are, again,

4   those mentioned in the 1992 Hunt study, including, among others, egg characteristics and

5   the small size of the desert eagle.  *Id.*  These characteristics were considered carefully in

6   the 2012 Finding, as was the Hunt study.  77 Fed. Reg. at 25807.

7        The third and final peripheral population study mentioned in the 2009 draft is

8   Channell and Lomolino, 2000a, p. 85.  2012 AR 506.  The draft cites this study as

9   suggesting that peripheral populations survive more frequently than do populations in the

10  core of their historical range when species undergo dramatic reductions in their range.  *Id.*

11  The draft then again mentions the 1992 Hunt study, and also asserts that desert eagles

12  survived DDT better than did other bald eagle populations, an indication that they fit the

13  pattern observed by Channell and Lomolino.  This aspect of the Channell and Lomolino

14  study is not addressed in the 2012 Finding.  The 2012 Finding does note, however, that

15  bald eagles survive throughout North American, in a variety of settings, and are not

16  limited to any particular core range, findings that would seem to be at least partially

17  responsive to the discussion in the 2009 draft.

18       The Court concludes that the essential points made by the 2009 draft report from

19  the first two peripheral population studies – that peripheral populations may develop

20  specific traits valuable to the species as a whole, as possibly illustrated by the 1992 Hunt

21  study – are addressed directly in the 2012 Finding and in more detail than in the 2009

22  draft.  Although the essential point made by the 2009 draft from the third study is not

23  addressed directly, it is addressed indirectly, and the Court cannot conclude from this

24  single omission that the 2012 Finding is arbitrary and capricious.[5]

25

26       [5] Plaintiffs cite briefly to another early draft of a desert eagle study that mentioned
    studies by Levin (1970) and Meffe (1997).  Doc. 52 at 14.  But the discussion of these
27  studies again focuses on adaptations that may result from a population's isolation.  *See*
    2010 AR 3987 ("When a peripheral population is isolated from other populations, the
28  isolated peripheral population may become *highly adapted* to local conditions.")
    (emphasis added).  The same is true of other studies mentioned in the draft.  They are
    described as showing that peripheral populations may "*exhibit adaptations*" to their

1      Nor can the Court conclude that the 2012 Finding's evaluation of the "significant

2    gap" factor is seriously flawed.  A holistic look at a species' population is appropriate

3    when assessing whether a population gap would be significant to the species as a whole.

4    *See, e.g., Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 849 (9th Cir. 2003) ("In

5    other listing rules, the FWS has found a gap to be significant due to the loss of the United

6    States range of a population *only where some additional significance to the taxon as a*

7    *whole also existed*.") (emphasis added).  Moreover, the previous FWS "significant gap"

8    findings identified by Plaintiffs are distinguishable.  *See, e.g.*, 75 Fed. Reg. 3424-01

9    (finding that loss of marbled murrelet population would create significant gap where

10   population made up 18 percent of the total distribution of species; the inhabited area

11   contained an ecologically distinct forest system; peripheral population played an

12   important role in maintaining opportunities for future biodiversity and speciation; and

13   recovery of species without peripheral population may be impossible); 62 Fed. Reg.

14   10730-01 (assessing peripheral nature of population of Arizona pygmy owl,

15   acknowledging that peripheral nature of population may increase potential for population

16   to diverge genetically, but concluding there was no evidence that population was, in fact,

17   genetically distinct or that its loss would significantly affect the genetic diversity of the

18   species as a whole); 62 Fed. Reg. 4183-01 (analyzing northern population of the

19   copperbelly water snake, which constituted eight of thirteen clusters of entire population

20   of species, completely cut off from southern population, making immigration between

21   populations impossible).

22      **D.    Climate Change.**

23      Plaintiffs argue that FWS failed to consider the impacts of climate change as a

24   relevant DPS factor.  Doc. 52 at 18.  Plaintiffs argue that climate change was considered

25   in earlier draft findings and should therefore have been considered in the 2012 Finding.

26   Doc. 52 at 18.  The earlier draft cited by Plaintiffs, however, addressed climate change

27

28   unique setting.  *Id.* at 3988 (emphasis added).  Such adaptations are precisely what the
     2012 Finding studied in detail.

1   for this reason: "Bald eagles in the Sonoran Desert Area, having persisted in a drier, less
2   humid environment, *may be better adapted* to conditions in different areas as
3   temperatures increase." 2012 AR 451 (emphasis added). Again, the earlier draft focused
4   on possible adaptations that would make the desert eagle important to the bald eagle
5   species as a whole. As discussed at length above, the 2012 Finding considered carefully
6   whether the desert eagle has adapted to the desert environment in ways that would help
7   bald eagles generally, and could find no evidence that it has. This inquiry essentially
8   answered the question posed by Plaintiff's climate change argument – whether desert
9   eagles have unique characteristics that could help bald eagles as a whole in an era of
10  global warming. Given the detailed analysis of adaptation evidence in the 2012 Finding,
11  the Court cannot conclude that the finding is fatally flawed simply because FWS did not
12  conduct the analysis under the heading of "climate change."[6]

13            **E.    Significance Conclusion.**

14            In summary, the Court cannot conclude that the 2012 Finding "relied on factors
15  which Congress has not intended it to consider, entirely failed to consider an important
16  aspect of the problem, offered an explanation for its decision that runs counter to the
17  evidence before the agency, or is so implausible that it could not be ascribed to a
18  difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n,* 463
19  U.S. at 43. The Court finds that the 2012 Finding is "founded on a rational connection
20  between the facts found and the choices made," and that FWS has not made "a clear error
21  of judgment." *Ariz. Cattle Growers' Ass'n,* 273 F.3d at 1243. And despite Plaintiffs'
22  best arguments to the contrary, the Court cannot conclude that the 2012 Finding is the
23  result of earlier "marching orders" that Judge Murguia appropriately found to be
24  improper.

---

[6] The Court notes that although FWS did not mention climate change in assessing the significance element of the DPS finding, it did take an in-depth look at the impacts of climate change in conducting its threat assessment. 77 Fed. Reg. at 25825-26.

1    **V.      Threatened or Endangered.**

2         A population must qualify as a DPS before becoming eligible for a threatened or

3    endangered listing.  61 Fed. Reg. 4722.  Because the Court upholds FWS's conclusion

4    that the significance element of the DPS Policy is not satisfied, and that the desert eagle

5    therefore does not qualify as a DPS, the Court need not reach the question of whether

6    FWS acted arbitrarily and capriciously in finding the desert eagle not threatened or

7    endangered.

8    **VI.     Motion to Strike.**

9         Plaintiffs ask the Court to strike the September 26, 2014 filing by FWS entitled

10   "Defendants' Notice of Completion of Internal Review" and the accompanying exhibit.

11   Doc. 71 at 2.  This filing concerns a finding by an internal Scientific Integrity Officer

12   regarding FWS's desert eagle decision.  Plaintiffs argue that this material was produced

13   years after the agency decision in this case, is outside the administrative record, and

14   cannot be considered by the Court in its evaluation of the 2012 Finding.  Doc. 71 at 4.

15   The Court agrees.  Judicial review is normally limited to the administrative record in

16   existence at the time of the agency's decision.  *Friends of the Clearwater v. Dombeck*,

17   222 F. 3d 552, 560 (9th Cir. 2000).  The motion to strike will therefore be granted.

18        **IT IS ORDERED** that Defendants' cross-motion for summary judgment

19   (Doc. 63) is **granted**, Plaintiffs' motion for summary judgment (Doc. 30) is **denied**, and

20   Plaintiffs' motion to strike (Doc. 70) is **granted**.  The Clerk is directed to enter judgment

21   accordingly.

22        Dated this 4th day of November, 2014.

_____
David G. Campbell
United States District Judge